IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

OUTDOOR AMUSEMENT BUSINESS
ASSOCIATION, INC. *et al.*,
    *Plaintiffs*,

          *v.*

DEPARTMENT OF HOMELAND SECURITY
*et al.*,
    *Defendants*.

Civil Action No. ELH-16-1015

## MEMORANDUM OPINION

This Memorandum Opinion resolves a motion to intervene in a suit challenging the authority of certain government agencies to issue regulations that govern the H-2B visa program. The program governs temporary employment of nonimmigrant aliens.

The plaintiffs are Outdoor Amusement Business Association, Inc.; Maryland State Showmen's Association, Inc.; The Small and Seasonal Business Legal Center; Lasting Impressions Landscape Contractors, Inc.; Three Seasons Landscape Contracting Services, Inc.; and New Castle Lawn & Landscape, Inc. They are companies and associations whose members rely on the H-2B visa program. ECF 44, ¶¶ 12-17. Plaintiffs have sued the following defendants: Department of Homeland Security ("DHS"); the United States Citizenship & Immigration Services ("USCIS"); the Department Of Labor ("DOL"); Employment & Training Administration ("ETA"), a component agency of DOL; and the Wage & Hour Division ("WHD"), also a component agency of DOL, defendants.

Suit was filed in April 2016 (ECF 1), but the operative complaint is the Second Amended Complaint, filed on July 5, 2016 (ECF 44, "SAC"). Plaintiffs outline the H-2B visa program as follows, ECF 44, ¶ 26:

Since 1952, the purpose of the temporary employment H visas, including the H-2B program, has been to alleviate U.S. labor shortages for temporary work and provide nonimmigrant alien labor to fill those temporary or seasonal positions. The H-2B program protects the interests of both U.S. non-agricultural workers and employers, as well as the U.S. economy as a whole, through the preservation of jobs, work opportunities, and employers in the United States. The H-2B program is a legally-authorized source of employees for difficult-to-fill temporary positions, and supports the employment of countless other U.S. workers whose jobs rely on the temporary work performed by foreign workers.

According to plaintiffs, DHS and DOL have violated the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq*., and the Administrative Procedure Act ("APA"), codified in various sections of 5 U.S.C., as well as the United States Constitution, by jointly issuing certain regulations. ECF 44, ¶ 4. In particular, plaintiffs contend that DHS has impermissibly "redelegate[d]" its rulemaking authority to DOL by, *inter alia*, allowing DOL to undertake the initial review of the visa program applications. *Id.*; *see also id.*, ¶ 35.

The contested regulations include the *Temporary Non-Agricultural Employment of H-2B Aliens in the United States*, 80 Fed. Reg. 24,042 (Apr. 29, 2015) ("Interim Final Rule"), and the *Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program*, 80 Fed. Reg. 24,146 (Apr. 29, 2015) ("Final Rule"). ECF 44, ¶ 2. The rules establish "the process by which employers obtain a temporary labor certification from DOL for use in petitioning DHS to employ a[n H-2B] nonimmigrant worker," 80 Fed. Reg. at 24,042, "the methodology by which DOL calculates the prevailing wages to be paid to H-2B workers and U.S. workers recruited in connection with application for temporary labor certification," *id.* at 24,146, and "enforcement procedures and remedies pursuant to DHS's delegation of enforcement authority to DOL." *Id.* at 24,046.

In addition, plaintiffs challenge certain DHS regulations "collectively referred to and identified …as DHS's Labor-Certification Regulations." ECF 44, ¶ 2; *see also id.*, ¶ 34; 8 C.F.R.

§ 214.2 (h)(6). The Labor-Certification Regulations, issued in 2008, "govern DHS's administration of the H-2B program generally, including DOL's role in the program." ECF 69 at 11.

Plaintiffs contend that the regulatory scheme is "unworkable" (ECF 44, ¶ 8) and causes unnecessary delay in visa processing. They assert that "H-2B workers are now arriving weeks, and often months, after employers' dates of need," which has harmed plaintiffs and/or their members' businesses. *Id.*, ¶ 8. Therefore, plaintiffs ask the Court to enter an Order "enjoining the Defendants nationwide from implementing the unlawful" Interim Final Rule, the Final Rule, and the Labor-Certification Regulations. *Id.*, ¶ 115.

On January 20, 2017, nearly ten months after the suit was filed, Margharita Kuri; Timothy King; Andrew Mitschell; Henry Wojdylo; Ronald Nyenhuis; Shirley Harmon; Antonio Rivera Martinez ("Individual Movants"); and Comité de Apoyo a los Trabajadores Agrícolas ("CATA"); Pineros y Campesinos Unidos del Noroeste ("PCUN"); and Northwest Forest Workers Center ("NFWC") (collectively, "Movants"), filed a motion to intervene as defendants (ECF 74), supported by a memorandum of law (ECF 74-12) (collectively, "Motion" or "Motion to Intervene"), and numerous exhibits and declarations. ECF 74-1 to ECF 74-11; ECF 74-13; ECF 74-14; ECF 75. Movants are U.S. workers who allegedly compete with H-2B visa workers for employment, and groups representing U.S. workers who allegedly compete with H-2B workers for employment. ECF 74 at 1.

Defendants did not respond to the Motion. But, plaintiffs oppose the Motion (ECF 79, "Opposition"), supported by exhibits. ECF 79-1 to ECF 79-10. Movants have replied (ECF 80, "Reply"), supported by an affidavit (ECF 80-1) and two exhibits. ECF 80-2; ECF 80-3.[1]

No hearing is necessary to resolve the Motion to Intervene. *See* Local Rule 105.6. For the reasons that follow, I shall deny the Motion. However, Movants shall be permitted to participate collectively as amicus curiae.

## I.      Factual Summary[2]

### A.  H-2B Visa Program

In 1952, as part of the INA, "Congress created the nonimmigrant H-2 visa category for temporary agricultural and non-agricultural employment that did not require advanced education, skills, or training." ECF 44, ¶ 25. Thereafter, the Immigration Reform and Control Act of 1986 "redesignated the extant H-2 classification as the nonagricultural H-2B visa category, and moved agricultural labor into a newly-created H-2A category." *Id.* The H-2B visa program permits U.S. employers to recruit and hire foreign workers to fill temporary unskilled, non-agricultural positions for which domestic workers cannot be located. *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(b); *La. Forestry Ass'n, Inc. v. Sec'y of Labor*, 745 F.3d 653, 658 (3d Cir. 2014).

An H-2B employee is defined as a nonimmigrant alien "having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform other temporary service or labor if unemployed persons capable of performing such

---

[1] Defendants have submitted a notice of filing of the administrative record. ECF 46. Plaintiffs filed a "Motion To Strike And Correct Record Certification, Motion To Complete And Supplement The Record, And Motion For Discovery" (ECF 60), supported by a memorandum of law (ECF 60-1) (collectively, "Motion to Strike"), and numerous exhibits. ECF 60-2 to ECF 60-19. This Memorandum Opinion does not address the Motion to Strike.

[2] For the purposes of this Memorandum Opinion, it is unnecessary to review the factual allegations in detail.

service or labor cannot be found in this country….” 8 U.S.C. § 1101 (a)(15)(H)(ii)(b). The INA

charges DHS with determining, “upon petition of the importing employer,” whether to grant an

H-2B visa “after consultation with appropriate agencies of Government.” 8 U.S.C. § 1184(c)(1);

*see also* ECF 46, ¶ 28.

Pursuant to DHS's Labor-Certification Regulations, DHS has asked DOL to determine

whether (1) qualified workers in the United States are available to fill an employer’s job and

whether (2) the alien’s employment will adversely affect wages and working conditions of

similarly employed U.S. workers. 8 C.F.R. § 214.2(h)(6)(iii)(A). If, after reviewing an

employer’s job offer and recruitment efforts, the Secretary of Labor determines that U.S. workers

are not available to fill the jobs described in the employer’s application and that the offered terms

of work will not adversely affect similarly employed U.S. workers, DOL issues a “temporary

labor certification” that the employer must attach to the H-2B visa petition it submits to DHS. 8

C.F.R. §§ 214.2(h)(6)(iii)(C) and 214.2(h)(6)(iv)(A). No petition for H-2B visas may be issued

by DHS without an approved labor certification from DOL. *Id.*

On April 29, 2015, DHS and DOL jointly issued revised H-2B regulations. These

include program administration regulations known as the "2015 Program Rules" and Wage and

Hour Division enforcement regulations known as the "2015 Enforcement Rules", published at 80

Fed. Reg. 24,042, *i.e.*, the Interim Final Rule, and wage methodology regulations published at 80

Fed. Reg. 24,146, *i.e.*, the Final Rule (collectively, the “2015 Rules”).

Specifically, the Interim Final Rule “expands the ability of U.S. workers to become aware

of the job opportunities in question and to apply for opportunities in which they are interested”

and “requir[es] that U.S. workers in corresponding employment receive the same wages and

benefits as the H-2B workers.” *See* 80 Fed. Reg. at 24,043. The regulations also provide

additional protections to H-2B workers (such as guaranteed minimum hours and reimbursements for visa and transportation expenses) and to whistleblowers. *See id.* The Final Rule "set[s] the methodology by which DOL calculates the prevailing wages to be paid to H-2B workers and U.S. workers recruited in connection with applications for temporary labor certification." *See* 80 Fed. Reg. at 24146.[3]

The 2015 Rules replace the prior H-2B regulations published at 73 Fed. Reg. 78,020 (Dec. 19, 2008) ("2008 Final Rule"), which were regarded as "vulnerable to challenges by employers in current and future enforcement proceedings based on the ground that the regulations…are void because DOL exceeded its statutory authority in unilaterally issuing the 2008 rule." *See* 80 Fed. Reg. at 24,048-49. Among other things, various provisions of the 2008 Final Rule were invalidated by the United States District Court for the Eastern District of Pennsylvania in *Comité de Apoyo a los Trabajadores Agrícolas v. Solis*, No. 09-240, 2010 WL 3431761 (E.D. Pa. Aug. 30, 2010) ("*CATA*"). *See* 80 Fed. Reg. at 24,046.

According to defendants, the 2015 Rules "govern DOL's consultative role, as designated by DHS, in the H-2B non-agricultural, temporary worker program, and supersede all prior such Rules." ECF 69 at 11. Movants assert: "The agencies issued the 2015 Rule[s] to improve the H-2B temporary certification process and to increase worker protections." ECF 74-12 at 2-3.

---

[3] In particular, the Final Rule "establishes that, in the absence of a wage set in a valid and controlling collective bargaining agreement, the prevailing wage will be the mean wage for the occupation in the pertinent geographic area derived from the Bureau of Labor Statistics Occupational Employment Statistics survey, unless the H-2B employer meets the conditions for requesting that the prevailing wage be based on an employer-provided survey." 80 Fed. Reg. at 24146. And, "[a]ny such survey submitted must meet the new methodological criteria established in this final rule in order to be used to establish the prevailing wage." *Id.*

### B. Movants[4]

Movants are "(i) seven U.S. workers employed in Florida and Pennsylvania in occupations where H-2B workers have been and are currently being employed and (ii) three membership organizations that represent the interests of their U.S. worker and foreign worker members." ECF 74-12 at 3-4. Six of the seven Individual Movants aver in their declarations that, based on personal experience and from talking to coworkers and friends who work in their respective fields, and in their same locales, many of the jobs in their respective fields are filled by H-2B workers.

#### 1. Margharita Kuri

Margharita Kuri is a legal permanent resident of the United States who is currently employed as a housekeeper in Boca Raton, Florida. ECF 74-2, Declaration of Kuri, at ¶¶ 1-2. She earns $9.00 per hour. *Id.*, ¶ 2. Previously, she worked as a personal care aide in Boca Raton and surrounding areas in Palm Beach, Florida. *Id.* Kuri is currently applying for similar jobs in the same area. *Id.*, ¶ 3.

#### 2. Timothy King

Timothy King is a U.S. citizen. Since 1987, he has worked as a dishwasher in Boynton Beach, Florida and surrounding areas of Palm Beach County, Florida. ECF 74-3, Declaration of King, at ¶¶ 1-2. He is currently unemployed but he earned $7.00 per hour at his last dishwashing job. *Id.*, ¶ 2. He is applying for dishwashing jobs. *Id.*, ¶ 3.

#### 3. Andrew Mitschell

Andrew Mitschell is a U.S. citizen. Since 2013, he has worked in food preparation and serving jobs in Lake Worth, Florida and surrounding areas in Palm Beach County, Florida. ECF

---

[4] The factual information regarding Movants is derived from the Motion to Intervene and the declarations attached to the Motion.

75, Declaration of Mitschell, at ¶¶ 1-2. He is unemployed but earned $9.45 per hour at his last food preparation and serving job. *Id.,* ¶ 2. He is currently applying for jobs in the food preparation and service industry in Palm Beach County, Florida. *Id.,* ¶ 3.

### 4. Henry Wojdylo

Henry Wojdylo is a U.S. citizen who has been employed as a construction worker for over 40 years. ECF 74-4, Declaration of Wojdylo, at ¶¶ 1-2. At his most recent construction job in West Palm Beach, Florida, he earned $15.00 per hour. *Id.,* ¶ 2. He is unemployed and is currently applying for construction jobs in "his area." *Id.,* ¶¶ 2-3.

### 5. Ronald Nyenhuis

Ronald Nyenhuis is a legal permanent resident who is currently employed as a construction worker in West Palm Beach County, Florida. ECF 74-5, Declaration of Nyenhuis, at ¶¶ 1-2. For approximately 22 years, he has worked in construction in West Palm Beach County and surrounding areas in Palm Beach County. *Id.*, ¶ 2. He earns $22.00 per hour at his current job. *Id.* Nyenhuis regularly looks for better paying construction jobs. *Id.,* ¶ 3.

### 6. Shirley Harmon

Shirley Harmon is a U.S. citizen who is currently employed as a child care worker in Pahokee, Florida. ECF 74-6, Declaration of Harmon, at ¶¶ 1-2. She has been employed in that field, in Pahokee as well as surrounding areas of Palm Beach County, Florida, for approximately 17 years. *Id.*, ¶ 2. She earns $8.10 per hour at her current job. *Id.* Harmon regularly looks for better paying jobs in her field. *Id.,* ¶ 3.

### 7. Antonio Rivera Martinez

Antonio Rivera Martinez was born in Mexico and is a lawful permanent resident of the United States. ECF 74-7, Declaration of Martinez, ¶ 2. He has worked as a seasonal landscape

laborer for an employer in Chester County, Pennsylvania, since 2007. *Id.,* ¶ 3. Martinez has "been an employment authorized U.S. worker" since April 2011. *Id.*, ¶ 5. In 2007 and 2008, he worked as an H-2B landscaping worker. *Id.*, ¶ 4.

According to Movants, "[i]n both 2015 and 2016 [Martinez] was engaged in 'corresponding employment' within the meaning of the H-2B regulations at 20 C.F.R. § 655.5 (2015) by this landscaping employer that had certified application for H-2B workers." ECF 74-12 at 7; *see also* ECF 74-7, ¶ 9. Martinez's employer employs H-2B landscaping workers. ECF 74-7, ¶¶ 6, 8. Martinez's employer offered him employment in 2017 but also informed him that the company is applying for H-2B workers again this season. *Id.,* ¶ 11. For the past two years, Martinez has been paid at a rate of $16 an hour, and his employer has promised to pay him at least $16 an hour in 2017. *Id.*, ¶¶ 3, 12.

## 8. CATA

CATA is a membership organization open to farmworkers, members of the immigrant worker community, and their supporters. ECF 74-9, Declaration of Jessica Culley, General Coordinator of CATA, at ¶ 3. CATA's 2,500 members live and work primarily in New Jersey, southeastern Pennsylvania, Delaware, and "eastern" Maryland. *Id.*, ¶¶ 3, 5. "Members include employment authorized individuals in the following industries: agriculture, landscaping, construction, nurseries, food processing, and many other kinds of jobs." *Id.,* ¶ 3. CATA's members have also included H-2B workers who have been seasonally employed in landscaping jobs in Pennsylvania. *Id.*, ¶ 6. "Through its work, CATA strives to improve the working and living conditions of its members and member communities." *Id.*, ¶ 7. "CATA seeks to protect its members' interest in ensuring that the U.S. government protects the rights of both U.S. workers and non-agricultural H-2B workers in employment." *Id.*

### 9.  PCUN

PCUN is a union that consists of U.S. workers in industries that employ H-2B workers, such as reforestation, agriculture, landscaping, and hospitality, among others. ECF 74-10, Declaration of Ramon Ramirez, the president of PCUN, at ¶¶ 3, 5-6. PCUN represents over 6,500 workers, most of whom are working in Oregon, Washington, Idaho, or Northern California.  *Id.*, ¶ 4. One of PCUN's organizational purposes is to "empower" its worker members to "recognize and take action against worker exploitation." *Id.*, ¶ 3. PCUN's members include workers who are allegedly in direct competition with H-2B workers for jobs, in particular in the reforestation industry. *Id.*, ¶¶ 6-8.

### 10.  NFWC

NFWC is a membership organization that "empowers" forest workers and harvesters of non-timber forest products in the Pacific Northwest (California, Oregon, and Washington). ECF 74-11, Declaration of Carl Wilmsen, Executive Director of NFWC, at ¶ 3. Its membership consists of both U.S. workers and H-2B workers who labor in the forestry and harvesting industries.  *Id.,* ¶ 4. The forestry industry in the Pacific Northwest "is thoroughly penetrated by H-2B workers." *See id.* at ¶ 7. For that reason, NFWC's U.S. worker members allegedly compete routinely with H-2B workers for jobs. *Id.* ¶ 11.

## II.      Intervention Generally

Intervention is governed by Rule 24 of the Federal Rules of Civil Procedure.  It provides, in relevant part:

> (a) INTERVENTION OF RIGHT. On timely motion, the court must permit anyone to intervene who:
>
>> (1) is given an unconditional right to intervene by a federal statute; or

(2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

(b) PERMISSIVE INTERVENTION.

(1) *In General.* On timely motion, the court may permit anyone to intervene who:

(A) is given a conditional right to intervene by a federal statute; or

(B) has a claim or defense that shares with the main action a common question of law or fact.

\*\*\*

(3) *Delay or Prejudice.* In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

The Movants seek intervention under Fed. R. Civ. P. 24(a) and (b).

## A. Intervention of Right

In *Stuart v. Huff*, 706 F.3d 345 (4th Cir. 2013), the Fourth Circuit explained the standard for intervention of right under Rule 24(a)(2). It said, *id.* at 349-50 (quoting *Teague v. Bakker*, 931 F.2d 259, 260-61 (4th Cir. 1991)):

[A] district court must permit intervention as a matter of right if the movant can demonstrate "(1) an interest in the subject matter of the action; (2) that the protection of this interest would be impaired because of the action; and (3) that the applicant's interest is not adequately represented by existing parties to the litigation."

In addition to the three factors articulated in *Stuart*, "timeliness is [also] a 'cardinal consideration' of whether to permit intervention . . . ." *Houston Gen. Ins. Co. v. Moore*, 193 F.3d 838, 839 (4th Cir. 1999) (citation omitted). When assessing the timeliness of a motion to intervene, the court "is obliged to assess three factors: first, how far the underlying suit has progressed; second, the prejudice any resulting delay might cause the parties; and third, why the

movant was tardy in filing its motion." *Alt v. U.S. EPA*, 758 F.3d 588, 591 (4th Cir. 2014). "The determination of timeliness is committed to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion." *Id.*

In order to intervene as of right, a movant's interest in the action must be "'significantly protectable'" and a movant must "stand to gain or lose by the direct legal operation." *Teague*, 931 F.2d at 261 (quoting *Donaldson v. United States*, 400 U.S. 517, 531 (1971)). Moreover, "[w]hen the party seeking intervention has the same ultimate objective as a party to the suit, a presumption arises that its interests are adequately represented, against which the [movant] must demonstrate adversity of interest, collusion, or nonfeasance." *Virginia v. Westinghouse Elec. Corp.*, 542 F.2d 214, 216 (4th Cir. 1976) (alteration added); *see also Stuart*, 706 F.3d at 350.

Of relevance here, the Fourth Circuit has explained "that where the party who shares the intervenor's objective is a government agency, the intervenor has the burden of making a strong showing of inadequacy." *Stuart*, 706 F.3d at 350. In such a case, the would-be intervenor must rebut a "presumption of adequate representation." *Id.* at 353. This heightened showing is required because "when a statute comes under attack, it is difficult to conceive of an entity better situated to defend it than the government" and "to permit private persons and entities to intervene in the government's defense of a statute upon only a nominal showing would greatly complicate the government's job." *Id.* at 351. For example, "the government could be compelled to modify its litigation strategy to suit the self-interested motivations of those who seek party status . . . ." *Id.*

Recognizing that statutes are passed "through the democratic process," the Court observed that "'the business of government could hardly be conducted if, in matters of litigation, individual citizens could . . . intervene and assert individual points of view.'" *Id.* (Citation

omitted).  Thus, the Fourth Circuit said that when the government agency and the would-be intervenor share the same objective, "the putative intervenor must mount a strong showing of inadequacy.  To hold otherwise would place a severe and unnecessary burden on government agencies as they seek to fulfill their basic duty of representing the people in matters of public litigation."  *Id.* at 352.

Nevertheless, the presumption of adequate representation is not rebutted simply by showing that the would-be intervenor disagrees with the government's "reasonable litigation tactics," or that the would-be intervenor has "stronger" or "more specific" interests than the government. *Stuart*, 706 F.3d at 352.  The Court said, *id.* at 353: "In this context, the relevant and settled rule is that disagreement over how to approach the conduct of the litigation is not enough to rebut the presumption of adequacy."

## B.  Permissive Intervention

Even if Rule 24(a)(2) does not mandate intervention, a party may be entitled to permissive intervention under Rule 24(b).  *See Stuart*, 706 F.3d at 349.  The decision to grant or deny permissive intervention "'lies within the sound discretion of the trial court.'"  *Smith v. Pennington*, 352 F.3d 884, 892 (4th Cir. 2003) (quoting *Hill v. Western Elec. Co. Inc.*, 672 F.2d 381, 386 (4th Cir. 1982)); *see also McHenry v. C.I.R.*, 677 F.3d 214, 219 (4th Cir. 2012).

In *Shanghai Meihao Elec., Inc. v. Leviton Mfg. Co.*, 223 F.R.D. 386 (D. Md. 2004), then-District Judge Andre Davis distilled, from "the text of Rule 24(b) itself [and] case law interpreting the rule," four conditions with respect to permissive intervention.  They are as follows, *id.* at 387 (citations omitted; alterations added):

> (1) that [the intervenor's] motion is "timely"; (2) that its "claim or defense and the main action have a question of law or fact in common" . . . ; (3) that there exists an independent ground of subject matter jurisdiction; and, (4) that "intervention

will [not] unduly delay or prejudice the adjudication of the rights of the original parties."

*Stuart*, 706 F.3d 345, is informative as to permissive intervention under Rule 24(b). In that case, the plaintiffs lodged a constitutional challenge to a North Carolina abortion-related statute, which required compliance with certain informed consent procedures in order to obtain an abortion. A group of pro-life medical professionals, women who had previously undergone abortions, and pregnancy counseling centers sought to intervene as defendants, pursuant to Fed. R. Civ. P. 24(a) and (b). The district court denied their motion and the Fourth Circuit affirmed. *Id.* at 347.

Of relevant here, the Fourth Circuit recognized the challenges that flow from the addition of parties to an action. It said, *id.* at 350: "Additional parties can complicate routine scheduling orders, prolong and increase the burdens of discovery and motion practice, thwart settlement, and delay trial." *Id.* at 350. The Court also observed: "This is particularly so where . . . the proposed intervenors are themselves differently situated entities." *Id.* The Fourth Circuit concluded: "'Adding three groups of intervenors would necessarily complicate the discovery process and consume additional resources of the court and the parties.'" *Id.* at 354 (quotations omitted).

## III. Discussion

### A. Intervention as of Right

#### 1.

As noted, a motion to intervene under Rule 24(a) must be timely filed. *See Moore*, 193 F.3d at 839. Movants filed their Motion about ten months after suit was filed. But, they claim the Motion was timely. They assert, ECF 74-12 at 10:

> [A]lthough this case was filed April 5, 2016, nothing of substance has occurred in the case. Plaintiffs have amended their complaint twice and there is currently a dispute pending before the court on the exact composition of the administrative

record. Pursuant to the scheduling order, Plaintiffs' motion for summary judgment will not be due until seven days after the motion regarding the record is resolved. Applicants for Intervention are willing to abide by the current scheduling order.

In their Reply, Movants elaborate, ECF 180 at 7:

There are only three critical events in an APA challenge to agency action: (1) the filing of the complaint, (2) the filing of the administrative record, and (3) cross-motions for summary judgment. Only the first of these events - the filing of the complaint – has occurred in this case. The administrative record has not been filed because Plaintiffs are disputing what should be in the record. Applicants are willing to accept the briefing that has already been filed on that issue so that their motion to intervene will in no way delay the ultimate decision on the administrative record. Nor will their motion delay the briefings on summary judgment as the briefing on that issue has not yet begun. If permitted to intervene, Applicants will simply file their summary judgment brief at the same time as the government defendants, thereby avoiding any delay. Thus, far from being "mature" as the Plaintiffs claim, this case is at its very beginning with nothing of substance having yet occurred.

Movants also complain that their "delay in intervening stems in part from the lack of public access to the pleadings in this action." ECF 74-12 at 10. They explain, *id.* at 10-11: "Because of the Court's internal policies, the pleadings in this case are off limits to all but the parties and their counsel and are not accessible through the PACER system.[1]"

In their Opposition (ECF 79), plaintiffs counter that the Motion is not timely because litigation "has now matured on multiple fronts after nearly 11 months of extensive litigation." *Id.* at 7. Further, they argue that if the Movants are permitted to join the case, they will be prejudiced in several ways. *See id.* at 8-9. For example, plaintiffs assert that if the Motion to Intervene is granted, "[t]he Intervenors will raise theories of rulemaking authority without regard to the *Chenery* rule that prohibits the Government from raising *post hoc* theories not previously raised during the rulemaking process." *Id.* at 8; *see Securities & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943). Plaintiffs also argue that, "[i]f the Intervenors are allowed into the case, there are literally millions upon millions of U.S. workers who could raise the very

same arguments and seek to join this case, thereby adding complexity, cost, and a deluge of briefing." ECF 79 at 8.

Moreover, plaintiffs dispute Movants' explanation for their delay. ECF 79 at 9. They point out that counsel for Movants "knew - in writing - about this litigation within 8 days of filing the Complaint." ECF 79 at 9; *see also* ECF 79-7 (email from Art Read, Esquire to R. Wayne Pierce, Esquire, dated April 14, 2016); ECF 79-10 (Affidavit of R. Wayne Pierce, Esquire, lead counsel for plaintiffs). Specifically, plaintiffs assert that Movants' attorneys learned of this case because, under Local Rule 103.1(b)(4), it was filed as a "related case" with respect to the case of *Gonzalez-Aviles v. Perez*, MJG-15-3463, a matter for which one of Movants' attorneys is lead counsel. ECF 79 at 4. Plaintiffs add that Movants failed to explain the "sudden rush to file on the eve of the Inauguration for the new Administration." *Id.* at 9.

To begin, it is unclear why plaintiffs designated this case as an immigration case. In particular, plaintiffs characterized the case as "Other Immigration Actions" on the civil cover sheet when the matter was filed (item 465 on Form JS 44). However, it should have been designated as an Administrative Procedure Act review of agency action (item 899 on Form JS 44). Because immigration matters often contain sensitive personal data, public access to a case designated as an immigration action is restricted. Therefore, it was not available to Movants. Moreover, I agree with Movants that notice to their attorneys "at a time when they did not represent the [Movants]" does not constitute notice to the Movants. ECF 80 at 9.

Nevertheless, Movants' explanation for their delay in seeking to intervene is not persuasive. Movants have not indicated when or how they learned of the suit. But, Movants filed the Motion to Intervene on the day of the Inauguration of President Trump, under the belief that the Trump Administration will not "continue to forcefully defend the challenged regulations

in this Court." ECF 80 at 12. This evidences a change in strategy, from one of "deliberate forbearance" to a more proactive course of conduct. *Alt,* 758 F.3d at 591; *see also Moten v. Bricklayers, Masons, & Plasterers, Intern. Union of Am.,* 543 F.2d 224, 228 (D.C. Cir. 1976) (deeming motion to intervene untimely where decision not to seek earlier intervention was an informed and tactical choice).

Nonetheless, I agree with Movants that although several months have elapsed since the suit was filed, the case is still in its early stages. And, as Movants put it, "[t]he fact that [Movants] will raise theories of rulemaking authority that may differ from the government's…does not constitute prejudice." ECF 80 at 8.

Therefore, under the particular facts and circumstances of this case, the filing of the Motion some ten months after the suit was initiated is not a basis to deny the Motion.

## 2.

Movants argue that they have an interest in the regulations plaintiffs seek to vacate in this litigation because "the purpose of the regulations is to protect the wages and job opportunities not only of those U.S. workers employed directly by H-2B employers but also other U.S. workers who, while not working directly for an H-2B employer, work in industries and locations where H-2B workers are employed." ECF 74-12 at 13. And, the Individual Movants "fall into both categories of U.S. workers." *Id.* They elaborate: "The lower the wages and working conditions that such employers are permitted to pay, the greater the pressure on other employers to lower their wages and working conditions to meet the competition." *Id.*

Movants contend that, in the absence of intervention, their protectable interest will be impaired because plaintiffs seek to vacate the challenged regulations and "compel DHS to

continue to process H-2B labor certification applications without the benefit of those or any other regulations." ECF 74-12 at 12. They conclude, *id.* at 15:

> There is no question that if the Plaintiffs are successful in vacating all of DOL's and DHS' H-2B regulations, Applicants' interest in the protections provided by those regulations will be adversely affected. At best, the prior regulations published in December 2008 would have to be reinstated. Those regulations are so harmful to Applicants that they and other workers have filed (or intervened in) numerous lawsuits over the past nine years to vacate those regulations and compel DOL to publish new, more protective regulations.

Plaintiffs counter that Movants' interest in this case is speculative. ECF 79 at 9. They explain, *id.* at 9-10:

> [Movants] are speculating that the Government will acquiesce in an adverse judgment nationwide. They are also speculating that the Government will abandon its responsibility to protect them, but that cannot happen without public notice and comment. They have assumed without meeting their burden of proving that a few H-2B employers in a population of more than 1.3 million in Palm Beach County, Florida, would have an adverse impact on them….And they have submitted affidavits based on inadmissible hearsay and the prophetic ability to distinguish by sight otherwise indistinguishable citizens from unauthorized aliens or H-2B workers.

Movants cite *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986), for the proposition that "the Fourth Circuit has recognized that both U.S. workers employed by employers of visa workers and U.S. workers employed by businesses that compete with employers of visa workers have an interest in DOL's regulations sufficient to satisfy the interest requirement of Rule 24(a)(2)." ECF 74-12 at 14.

In *Feller*, 802 F.2d 722, apple growers who employed H-2, temporary foreign visa workers filed suit against the DOL and others to enjoin a DOL regulation controlling the piece rates that H-2 employers were required to pay. *Id.* at 724. Domestic workers employed by H-2 apple grower employers as well as U.S. workers employed by apple orchards that did not hire H-2 workers sought to intervene. *Id.* at 725-26. The district court denied intervention as of right

but the Fourth Circuit reversed. The Court concluded that apple workers employed by H-2 employers had an interest in the challenged regulation because it "directly" set their wages. *Id.* at 729; *see also id.* at 729-30. And, U.S. workers employed by non-H-2 orchards in the area also had an interest in intervening. The Court reasoned, *id.* at 730:

> Their wages were and are substantially contingent upon the availability of foreign workers to pick for growers in their state. If foreign workers had been unavailable, or available only at a higher piece rate, the wages of competing domestic pickers would have been higher in 1985. Moreover to the extent that this litigation impacts the [wage] which will be paid in the 1986 harvest season, the interest of competing domestic workers is clear.

I shall assume, without deciding, that pursuant to *Feller*, 802 F.2d 722, Movants have a "significantly protectable" interest in the challenged regulations that may be impaired as a result of this litigation. *Teague*, 931 F.2d at 261 (quotation marks and citation omitted). That determination does not resolve the matter, however. I must also determine whether the defendants will adequately represent Movants' interests.

Movants assert that defendants will not adequately represent or protect their interests. They also claim that their burden to show inadequate representation is "'minimal.'" ECF 74-12 at 16 (citation omitted).

According to Movants, their "interests diverge from those of the government in several important respects." ECF 74-12 at 16. They assert: "These divergences stem from the fact that, in administering the H-2B temporary foreign labor program, DOL and DHS have a duty to balance the interests of employers and workers." *Id.* at 16-17 (citing *CATA v. Perez*, 774 F.3d 173, 177 (3d Cir. 2014); *Rogers v. Larson*, 563 F.2d 617, 626 (3d Cir. 1977)). Movants conclude: "Because the federal Defendants are bound to balance competing interests, they cannot adequately represent the narrower and more focused interests of the Applicant workers." ECF 74-12 at 17.

As noted, "[w]hen the party seeking intervention has the same ultimate objective as a party to the suit, a presumption arises that its interests are adequately represented, against which the [movant] must demonstrate adversity of interest, collusion, or nonfeasance." *Virginia*, *supra*, 542 F.2d at 216; *see also Stuart*, 706 F.3d at 350. Moreover, when "the party who shares the intervenor's objective is a government agency, the intervenor has the burden of making a strong showing of inadequacy." *Stuart*, 706 F.3d at 350.

Here, both defendants and Movants seek the same result: to uphold and defend the challenged regulations. In particular, in the defendants' detailed, twelve-page Answer to the SAC, they state that "neither DHS nor DOL exceeded its statutory authority as a matter of law…" ECF 45 at 9. Although the result of upholding the regulations "may lead to different legal and economic circumstances" for Movants and defendants, "their ultimate objective remains the same." *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Perlberg*, 268 F.R.D. 218, 225 (D. Md. 2010); *see also Stuart*, 706 F.3d at 352 ("Both the government agency and the would-be intervenors" shared same ultimate objective because they "want[ed] the [challenged] statute to be constitutionally sustained.") (alterations added).

It is readily apparent here that the ultimate objective of the defendants overlaps substantially with the Movants' objectives. Thus, the Intervenors may overcome the presumption of adequate representation only by showing adversity of interests, collusion, or nonfeasance, which they have failed to do. *Virginia*, 542 F.2d at 216.

To be sure, in *Feller*, 802 F.2d 722 at 730, the Fourth Circuit recognized that "the government's position is defined by the public interest, as well as the interests of a particular group of citizens." And, the Court concluded that "the nature of DOL and its conduct in this litigation to date indicate that DOL cannot adequately represent the interests of intervenors." *Id.*

But *Feller* was decided in 1986, well before the Fourth Circuit's 2013 decision in *Stuart*, 706 F.3d at 350, in which, as noted, the Court stated "that where the party who shares the intervenor's objective is a government agency, the intervenor has the burden of making a *strong* showing of inadequacy."    (Emphasis added.)   Moreover, in *Feller* the Fourth Circuit did not conclude that DOL could not adequately represent the interests of the intervenor-applicants *solely* because DOL's "position is defined by the public interest, as well as the interests of a particular group of citizens."  *Feller*, 802 F.2d at 730.  Rather, the Fourth Circuit concluded that DOL could not adequately represent the interests of the intervenor-applicants for several reasons, including "DOL's admission at oral argument that on the merits, it agree[d] with the [plaintiff] growers" and that DOL "made clear its intention to *argue against* the District of Columbia's interpretation of the piece rate regulations, *an interpretation preferred by intervenors*."  *Id.* (Emphasis added).

 *Feller* is factually inapposite.  In this case, defendants have vigorously sought to defend the challenged regulations.  Unlike in *Feller*, defendants here do not agree with plaintiffs' position.

 Movants also contend that the defendants' "potential inadequacy can also be demonstrated by its failure to challenge the Plaintiff Associations' standing."  ECF 74-12 at 18-19.  They argue, *id.* (emphasis in original):

> Because the relief that Plaintiffs seek is the *vacatur* of regulations governing the wages that their *members* must pay, the Plaintiff Associations' *members* are necessary participants in this suit which destroys the Plaintiffs' associational standing claims….Because only the individual Plaintiff Association members could pay restitution in the event of an erroneous judgment, their participation in this case is necessary and, as a result the Associations themselves lack standing.

 Even assuming the standing argument has merit, the fact that defendants have not raised it does not amount to nonfeasance.  The presumption of adequate representation is not rebutted

simply because defendants have chosen to focus on the merits or because the would-be intervenors disagree with the government's "reasonable litigation tactics." *Stuart*, 706 F.3d at 352. Indeed, in *Stuart*, the Court said, *id.* at 353: "In this context, the relevant and settled rule is that disagreement over how to approach the conduct of the litigation is not enough to rebut the presumption of adequacy." *See, e.g., Perry v. Prop. 8 Official Proponents,* 587 F.3d 947, 954 (9th Cir. 2009) ("Mere differences in litigation strategy are not enough to justify intervention as a matter of right.") (internal quotation marks omitted); *Saldano v. Roach,* 363 F.3d 545, 555 (5th Cir. 2004) ("Simply because the [intervenor] would have made a different [litigation] decision does not mean that the Attorney General is inadequately representing the State's interest."); *Chiglo v. City of Preston,* 104 F.3d 185, 188 (8th Cir.1997) (stating that "the proposed intervenor cannot rebut the presumption of representation by merely disagreeing with the litigation strategy ... of the party representing him."); *see also* 7C Charles Alan Wright et al., *Federal Practice and Procedure* § 1909 (3d ed. 2007) ("A mere difference of opinion concerning the tactics with which the litigation should be handled does not make inadequate the representation of those whose interests are identical with that of an existing party.").

Movants also express concern that the government will not continue "to forcefully defend the challenged regulations in this Court." ECF 80 at 12. In this regard, they observe that "President Trump's companies rely on the H-2B program." *Id.*; *see* Declaration of Ramon Ramirez, President of PCUN, ECF 74-10 at 3; Declaration of Carl Wilmsen, Executive Director of NFWC, ECF 74-11 at 4. Further, Movants contend: "The memorandum issued by Chief of Staff Priebus to all Heads of Executive Departments and Agencies on January 20, 2017 [ECF 80-2], as well as the Executive Order signed by President Trump on February 24, 2017 [ECF 80-3], indicate that the new Administration plans to rescind or weaken many regulations issued by

previous administrations, and particularly regulations which, like the challenged regulations, were issued by the Obama Administration." ECF 80 at 12.

Neither the memorandum (ECF 80-2) nor the Executive Order (ECF 80-3) specifically refers to the contested regulations. Movants' speculative concern that the Trump administration will not vigorously defend the contested regulations does not justify intervention. *See Ohio Valley Envtl. Coal., Inc. v. McCarthy*, 313 F.R.D. 10, 29 (S.D.W. Va. 2015) ("The mere allegation that a governmental party could argue less vigorously than members of the regulated industry is at best an argument that the government *could* commit nonfeasance, which is insufficient to rebut the presumption of adequate representation.") (Emphasis in original), *appeal dismissed sub nom. Ohio Valley Environmental v. West Virginia Coal Association,* App. No. 16-1049 (4th Cir. Jan. 14, 2016). *See also Virginia Uranium, Inc. v. McAuliffe,* No. 15–00031, 2015 WL 6143105, at *3 (W.D.Va. Oct. 19, 2015) (finding nonfeasance absent when government was already diligently and zealously defending the suit).

In sum, intervention of right is permitted only when all the criteria set forth in Fed. R. Civ. P. 24(a)(2) have been met. *Stuart*, 706 F.3d at 349-50. Movants have not demonstrated that defendants will not "adequately represent" their interests. *See Stuart*, 706 F.3d at 349-50. Accordingly, they have not established a basis for intervention of right.

### B. Permissive Intervention

In the alternative, Movants seek permissive intervention, pursuant to Fed. R. Civ. P. 24(b)(1)(B). They reiterate that intervention is appropriate because of their "economic interest in the outcome of this litigation…." ECF 74-12 at 20 n. 2. Movants also contend that they "raise several questions of law and fact common with the main action; for example, the defense that the 2015 Rule and the DHS regulations are validly promulgated." *Id.* at 20.

Plaintiffs argue that Movants do not meet the Fourth Circuit's standard for permissive intervention under Fed. R. Civ. P. 24(b) and incorporate their arguments opposing intervention of right regarding timeliness, undue delay, and prejudice. *See* ECF 79 at 13.

As noted, Movants maintain that intervention will not delay the case or prejudice the original parties. ECF 74-12 at 20. They observe that "nothing of substance has occurred in the case, and the Applicants are willing to abide by the existing scheduling order." *Id.* at 20.

However, Movants overlook the considerable complication that will result from the addition of ten parties to this case, some of whom are individuals and some of which are organizations. *See* Fed. R. Civ. P. 24(b)(3) (stating that Movant must show no undue delay or prejudice). "Additional parties can complicate routine scheduling orders, prolong and increase the burdens of discovery and motion practice, thwart settlement, and delay trial." *Stuart*, 706 F.3d at 350. And, "[t]his is particularly so where, as here, the proposed intervenors are themselves differently situated entities." *Id.*

Permitting intervention of several individuals and organizations would necessarily "result in undue delay in adjudication of the merits, without a corresponding benefit to existing litigants, the courts, or the process," particularly considering that the "existing Defendants are zealously pursuing the same ultimate objectives as the movants." *Stuart v. Huff*, 11-CV-804, , at *3 (M.D.N.C. Dec. 22, 2011) (noting that "[a]dding three groups of intervenors would necessarily complicate the discovery process and consume additional resources of the court and the parties."), *aff'd*, *Stuart*, 702 F.3d 345; *see also Shanghai Meihao Elec., Inc.*, 223 F.R.D. at 387.

In my view, conferring amicus status on Movants is a suitable alternative for them to bring their concerns to the Court's attention. *See, e.g.*, *Stuart*, 706 F.3d at 354 (denying intervention and noting that the movants "retain[ed] the ability to present their views . . . by

seeking leave to file amicus briefs"). Accordingly, I shall deny permissive intervention under Fed. R. Civ. P. 24(b)(1)(B).

## IV.    Conclusion

For the foregoing reasons, Movants' Motion to Intervene (ECF 74) shall be denied. However, they shall be granted amicus status. A separate Order follows, consistent with this Memorandum Opinion.

As discussed, plaintiffs designated this suit as an immigrant action, which resulted in restricted access to this case. In my view, this designation was improper. Accordingly, absent an objection filed within 14 days of the docketing of this Memorandum Opinion and Order, I will lift the restricted access to this case. Of course, if there is an existing submission for which the parties seek to retain the seal, they may submit a motion to seal that particular filing, due within 14 days of the docketing of this Memorandum Opinion and Order.

Date: June 26, 2017                                          _____/s/_____
                                                                          Ellen Lipton Hollander
                                                                          United States District Judge