IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

OUTDOOR AMUSEMENT BUSINESS
ASSOCIATION, INC., et al.,
    *Plaintiffs*,

          *v.*                        Civil Action No. ELH-16-1015

DEPARTMENT OF HOMELAND SECURITY
et al.,
    *Defendants*.

## MEMORANDUM OPINION

This case concerns a challenge to the validity of certain rules and regulations issued by

the Department of Homeland Security and the Department of Labor, pertaining to the H-2B visa

program (the "Program"). The Program governs the temporary employment of non-immigrant

foreign workers in non-agricultural businesses.

Plaintiffs are business entities who rely on the Program to obtain workers, as well as trade

associations whose members rely on the Program to maintain their workforces. ECF 44 (Second

Amended Complaint), ¶¶ 12-17. In particular, they are Outdoor Amusement Business

Association, Inc.; Maryland State Showmen's Association, Inc.; The Small and Seasonal

Business Legal Center; Lasting Impressions Landscape Contractors, Inc.; Three Seasons

Landscape Contracting Services, Inc.; and New Castle Lawn & Landscape, Inc. They have sued

the following defendants, *id.* ¶¶ 18-22: the Department of Homeland Security ("DHS"); the

United States Citizenship & Immigration Services ("USCIS"), a component agency of DHS that

operates service centers for adjudicating H-2B visas; the Department of Labor ("DOL"); the

Employment & Training Administration ("ETA"), a component agency of DOL that participates

in promulgating legislative regulations to administer the H-2B program; and the Wage & Hour

Division ("WHD"), another component of DOL, which promulgates legislative regulations "to enforce substantive requirements . . . imposed by DOL on employers in the H-2B program." *Id.* ¶ 22. At times, I shall refer to the defendants collectively as the "Government."

*Amici curiae* are individual U.S. workers employed in occupations in which H-2B workers are also employed. *See* ECF 83 (Order granting *amicus* status). Collectively, *amici* support the Government.

The Second Amended Complaint (ECF 44), filed on July 5, 2016, is the operative complaint. Plaintiffs seek declaratory and injunctive relief, claiming that the regulations promulgated by defendants to administer the Program are unlawful because DHS, to which Congress has delegated responsibility for the Program, impermissibly redelegated substantial parts of the Program's standards and administration to DOL. *See* ECF 44.

The suit focuses on four sets of legislative rules related to the Program. ECF 92-1 at 13-14. First, it concerns the 2015 Interim Final Rule, *Temporary Non-Agricultural Employment of H-2B Aliens in the United States*, promulgated on April 29, 2015, at 80 Fed. Reg. 24042. That rule consists of two components: the "2015 Program Rules," published at 20 C.F.R. § 655, and the "2015 Enforcement Rules" (a subset of the 2015 Program Rules, often referred to separately), published at 29 C.F.R. § 503. *See* ECF 44, ¶ 2. Next, plaintiffs challenge the 2015 Final Rule, *Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program*, also promulgated on April 29, 2015, at 80 Fed. Reg. 24146. ECF 44, ¶ 2. This rule includes the "2015 Wage Rule," also published at 20 C.F.R. § 655. I shall refer to the 2015 Program Rules, the 2015 Wage Rule, and the 2015 Enforcement Rules collectively as the "2015 Rules."[1] Last,

---

[1] According to plaintiffs, the 2015 Program Rules consist of ETA's administrative regulations and WHD's enforcement regulations. ECF 44, ¶ 40. The 2015 Enforcement Rules

plaintiffs challenge a number of subsections of what they term "DHS's Labor-Certification Regulations," published in 2008 at 8 C.F.R. §§ 214.1 and 214.2. I shall refer to these rules as the 2008 Labor-Certification Regulations.

In the lengthy Second Amended Complaint, plaintiffs outline the purpose of the Program, as follows, *id.* ¶ 26:

> Since 1952, the purpose of the temporary employment H visas, including the H-2B program, has been to alleviate U.S. labor shortages for temporary work and provide nonimmigrant alien labor to fill those temporary or seasonal positions. The H-2B program protects the interests of both U.S. non-agricultural workers and employers, as well as the U.S. economy as a whole, through the preservation of jobs, work opportunities, and employers in the United States. The H-2B program is a legally-authorized source of employees for difficult-to-fill temporary positions, and supports the employment of countless other U.S. workers whose jobs rely on the temporary work performed by foreign workers.

The Second Amended Complaint contains six counts. In Count I, plaintiffs assert that the 2015 Program Rules, the 2015 Wage Rule, and the 2008 Labor-Certification Regulations exceed defendants' statutory authority, citing 5 U.S.C. §§ 558 and 706(2)(C). Count II challenges the disputed regulations as arbitrary and capricious, citing 5 U.S.C. § 706(2)(A). In Count III, plaintiffs assert that the regulations are unconstitutional and violate 5 U.S.C. § 706(2)(B). Count IV is titled "Compulsion of Agency Action Unlawfully Withheld." It is predicated on 5 U.S.C. § 706(1). Count V is titled "Mandamus," pursuant to the Mandamus Act, 28 U.S.C. § 1361, and the All Writs Act, 28 U.S.C. § 1651. Finally, Count VI seeks a declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.[2]

---

represent "WHD's enforcement portion of the 2015 Program Rules." *Id.* And, the 2015 Wage Rule "represent[s] more of ETA's administrative regulations." *Id.*

[2] As noted, the 2015 Enforcement Rules are alleged to be part of the 2015 Program Rules, "except when separately identified." ECF 44, ¶ 40.

Following the submission of the voluminous Administrative Record (*see* ECF 46, ECF 87, ECF 129),[3] the parties submitted cross-motions for summary judgment. Plaintiffs' motion (ECF 91) is supported by a memorandum of law (ECF 92-1) (collectively, "Plaintiffs' Motion"), and exhibits.[4] Defendants filed a combined opposition to Plaintiffs' Motion, along with their own motion for summary judgment (ECF 102), supported by a Memorandum of Law. ECF 102-1 (collectively, "Defendants' Motion"). Thereafter, plaintiffs filed a combined opposition to Defendants' Motion and reply. *See* ECF 111-1 ("Plaintiffs' Reply").[5] Defendants also replied. ECF 113 ("Defendants' Reply"). And, *amici* submitted a memorandum of law in opposition to Plaintiffs' Motion. ECF 105 ("*Amici* Opposition").

The Court held oral argument on August 14, 2018. ECF 122.[6] Following the hearing, the Court invited limited supplemental briefing. ECF 121. Supplemental briefing was submitted by *amici* (ECF 123), plaintiffs (ECF 124), and the Government (ECF 125). The transcript for the motions hearing is docketed at ECF 126.

For the reasons that follow, I shall grant Defendants' Motion and deny Plaintiffs' Motion.

## I.     Factual and Procedural Summary

### A.  H-2B Visa Program

#### 1.  Program History

---

[3] Government counsel provided Chambers with both a compact disc and a paper copy of the record. *See* ECF 46; ECF 87. However, counsel failed to file a copy with the Clerk. Therefore, by Order of September 7, 2018, the Court directed counsel to do so. ECF 127. A copy of the administrative record was docketed on September 12, 2018, in paper format. *See* 129.

[4] Plaintiffs' Motion was filed as ECF 91. However, plaintiffs submitted a revised version of their memorandum of law in support of their Motion. *See* ECF 92-1.

[5] Plaintiffs' Reply was initially docketed at ECF 110. They provided a corrected submission, docketed at ECF 111-1.

[6] *Amici* were permitted to argue at the hearing.

In 1952, as part of the Immigration and Nationality Act ("INA"), 66 Stat. 163, as amended, 8 U.S.C. § 1101 *et seq.*, "Congress created the nonimmigrant H-2 visa category for temporary agricultural and non-agricultural employment that did not require advanced education, skills, or training." ECF 44, ¶ 25. Until 1986, one program existed for all temporary foreign workers. "Congress decided, however, that the earlier program did not 'fully meet the need for an efficient, workable and coherent program that protect[ed] the interests of agricultural employers and workers alike' and therefore amended the INA as part of the Immigration Reform and Control Act of 1986 to provide for two separate programs: the H-2A program for agricultural workers and the H-2B program for non-agricultural workers." *Bayou Lawn & Landscape Servs. v. Johnson*, 173 F. Supp. 3d 1271, 1276 (N.D. Fla. 2016) (quoting H.R. Rep. No. 99-682, pt. 1, at 80); *see also* Immigration Reform and Control Act of 1986 ("IRCA"), Pub. L. No. 99-603, § 301(a), 100 Stat. 3359, 3411 (codified at 8 U.S.C. § 1101(a)(15)(H)(ii)(a)-(b)).

The H-2B visa program permits U.S. employers to recruit and hire foreign workers to fill temporary unskilled, non-agricultural positions for which domestic workers cannot be located. *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(b); *Louisiana Forestry Ass'n, Inc. v. Sec'y of Labor*, 745 F.3d 653, 658 (3d Cir. 2014). An H-2B employee is defined as a nonimmigrant alien "having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform other temporary service or labor if unemployed persons capable of performing such service or labor cannot be found in this country . . . ." 8 U.S.C. § 1101(a)(15)(H)(ii)(b).

The statute identifies the Attorney General as the person responsible for determining whether to issue an H-2B visa. *See* 8 U.S.C. § 1184(c)(1). However, Congress transferred enforcement of immigration laws to the Secretary of DHS under the Homeland Security Act of

2002.  *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 402, 116 Stat. 2135, 2178 (2002).  Therefore, DHS is now charged with determining, "upon petition of the importing employer," whether to grant an H-2B visa "after consultation with appropriate agencies of the Government."  8 U.S.C. § 1184(c)(1).

## 2.  DOL's Involvement

Pursuant to the statutory direction to consult with appropriate agencies, DHS and its predecessors have for some 50 years looked to DOL for advice on whether United States workers capable of performing the desired temporary services or labor are available, and whether the alien's employment will adversely affect the wages and working conditions of similarly employed United States workers.  *See, e.g.*, 8 C.F.R. § 214.2(h)(6)(iii)(A).  In 1968, DOL first issued formal regulations establishing standards and procedures for certifying employers' requests to import H-2 workers.  *See* 33 Fed. Reg. 7570 (May 22, 1968).  DOL later supplemented the regulations with informal, non-binding guidance letters, which were promulgated without notice and comment.  *See Comite De Apoyo A Los Trabajadores Agricolas v. Solis*, No. CIV.A 09-240, 2010 WL 3431761, at *2 (E.D. Pa. Aug. 30, 2010) ("*CATA I*") (discussing issuance of guidance letters).  Then, in 2008, DOL published another formal regulation governing the labor certification process.  *See Labor Certification Process and Enforcement for Temporary Employment in Occupations Other Than Agriculture (H-2B Workers)*, 73 Fed. Reg. 78020 (Dec. 19, 2008) ("2008 DOL Rule").  These regulations concerned, *inter alia*, the wages that employers were required to pay H-2B workers.  *See* 73 Fed. Reg. at 78056-57.  These 2008 rules issued by DOL were the precursors to the 2015 Wage Rule and the 2015 Program Rules, and gave rise to a number of challenges to the administration of the H-2B program, of which this case is one.

Of importance here, beginning in 2008, DHS also began to require that employers petitioning DHS for H-2B visas must "apply for a temporary labor certification with the Secretary of Labor." 8 C.F.R. § 214.2(h)(6)(iii)(A). Pursuant to certain DHS labor certification regulations, issued in 2008, DOL is directed to determine whether (1) qualified workers in the United States are available to fill the petitioning employer's job and whether (2) an alien's employment will adversely affect wages and working conditions of similarly employed U.S. workers. 8 C.F.R. § 214.2(h)(6)(iii)(A). If, after reviewing an employer's job offer and recruitment efforts, the Secretary of Labor determines that U.S. workers are not available to fill the jobs described in the employer's application and that the offered terms of work will not adversely affect similarly employed U.S. workers, DOL issues a "temporary labor certification" that the employer must attach to the H-2B visa petition it submits to DHS. 8 C.F.R. §§ 214.2(h)(6)(iii)(C) and 214.2(h)(6)(iv)(A).

Notably, a "petitioner may not file an H-2B petition unless the United States petitioner has applied for a labor certification with the Secretary of Labor . . . within the time limits prescribed or accepted by each, and has obtained a favorable labor certification determination . . . ." *Id.* § 214.2(h)(6)(iii)(C). Thus, without a temporary labor certification from DOL, a petitioner cannot obtain H-2B visas. DHS provides no mechanism for an employer to challenge DOL's determination on this question.

On April 29, 2015, DHS and DOL jointly issued revised H-2B regulations: the *Temporary Non-Agricultural Employment of H-2B Aliens in the United States*, 80 Fed. Reg. 24042 (Apr. 29, 2015) ("2015 Interim Final Rule"), and the *Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program*, 80 Fed. Reg. 24146 (Apr. 29, 2015)

("2015 Final Rule").  ECF 44, ¶ 2.  Both the 2015 Interim Final Rule and the 2015 Final Rule are in effect.[7]

The 2015 Interim Final Rule and 2015 Final Rule replace the prior H-2B regulations published on December 19, 2008, at 73 Fed. Reg. 78020 ("2008 Program Rules").  The 2008 Program Rules were regarded as "vulnerable to challenges by employers in current and future enforcement proceedings based on the ground that the regulations . . . are void because DOL exceeded its statutory authority in unilaterally issuing the 2008 rule."  *See* 80 Fed. Reg. at 24048-49.

## B.  The Statutes

Several sections of the INA are relevant here.  As a general matter, the "Secretary of Homeland Security [is] charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens."  8 U.S.C. § 1103(a)(1).  As such, Congress has directed the Secretary to "establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter."  *Id.* § 1103(a)(3).  Notably, Congress has provided that the Secretary "is authorized to confer or impose upon any employee of the United States, with the consent of the head of the Department or other independent establishment under whose jurisdiction the employee is serving, any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the Service."  *Id.* § 1103(a)(6). "Service means U.S. Citizenship and Immigration Services, U.S. Customs and Border

---

[7] Plaintiffs refer to the Interim Final Rule as the "2015 Program Rules" and the "2015 Enforcement Rules."  They refer to the Final Rule as the "2015 Wage Rule."  ECF 44, ¶ 2.  The Government refers to the Interim Final Rule as the "2015 Interim Final Rule" or "2015 IFR."  And, they refer to the Final Rule as the "2015 Wage Final Rule."  ECF 69 at 11.

Protection, and/or U.S. Immigration and Customs Enforcement, as appropriate in the context in which the term appears." 8 C.F.R. § 1.2.

One of the Secretary's statutory responsibilities is the administration of the H-2B visa program. In particular, "[t]he admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the [Secretary] may by regulations prescribe." 8 U.S.C. § 1184(a)(1).[8] Section 1101(a)(15)(H)(ii)(b) of Title 8 is the source of the term "H-2B." As noted, it defines an H-2B worker as a nonimmigrant alien "having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform other temporary service or labor if unemployed persons capable of performing such service or labor cannot be found in this country . . . ."

Section 1184(c)(1) of Title 8 of the U.S. Code provides: "The question of importing any alien as a nonimmigrant . . . in any specific case or specific cases shall be determined by the [Secretary of DHS], *after consultation* with appropriate agencies of the Government, upon petition of the importing employer." (Emphasis added.) This case concerns, among other issues, the breadth of the term "consultation," which is not defined in the statute, as well as the scope of the Secretary's ability to "confer or impose upon any employee of the United States . . . any of the powers, privileges, or duties conferred or imposed . . . upon officers or employees of the Service."

## C. Litigation History

Consistent with the regulations described above, DOL has established various procedures to determine whether a qualified U.S. worked is available to fill the job described in the

---

[8] The statute, as initially written, assigned this duty to the Attorney General. However, as noted, the Homeland Security Act of 2002 transferred enforcement of the immigration laws from the Attorney General to the Secretary of DHS. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 402, 116 Stat. 2135, 2178 (2002).

employer's petition. Although, as noted, DOL had issued regulations concerning labor certifications as far back as 1968, for many years DOL set forth specific requirements on employers "via a series of General Administration Letters ('GALs') and Training and Employment Guidance Letters ('TEGLs')." *CATA I*, 2010 WL 3431761, at 2. These letters were promulgated without notice and comment. *See id.* In 2008, however, DOL promulgated a regulation designed "to modernize the procedures for the issuance of labor certifications to employers sponsoring H-2B nonimmigrants." 73 Fed. Reg. 78020, at 78020 (Dec. 19, 2008) (codified at 20 C.F.R. §§ 655-56) ("2008 DOL Rule"). The 2008 DOL Rule contained two major components: the 2008 Program Rules, which set forth the criteria for obtaining a temporary labor certification (73 Fed. Reg. at 78058), and the 2008 Wage Rule, which established the method for determining the prevailing wage for labor certification purposes. *See id.* at 78056.

"In order to issue a labor certification, the DOL must determine as a threshold matter, that qualified United States workers are not available to fill the position for which an employer seeks foreign workers." *Comite de Apoyo a los Trabajadores Agricolas v. Solis*, 933 F. Supp. 2d 700, 704 (E.D. Pa. 2013) ("*CATA II*"); *see* 8 C.F.R. § 214.2(h)(6)(iii). Because the availability of workers is inextricably linked to an employer's wages, "the DOL may only issue labor certifications where United States workers are unavailable to fill a given position at the occupation's 'prevailing wage.'" *Id.* (citing 2008 DOL Rule). As a result, before applying for a labor certification, "an employer must first obtain from the DOL a prevailing wage determination for the area of intended employment, submit a work order with a state workforce agency," and then "advertise the position at a wage equal to or higher than the prevailing wage, as established by the DOL." *Id.* at 705 (citing 2008 DOL Rule).

The 2008 Wage Rule contained "numerous significant changes from the prior regime." *CATA I*, 2010 WL 3431761 at 3. As a result, in 2009, shortly after the new regulations took effect, a group of plaintiffs filed suit in the Eastern District of Pennsylvania, challenging several substantive aspects of the 2008 DOL rule. *Id.* at 1. The *CATA I* Court upheld various aspects of the challenged rule. *See id.* at 12-14. But, it vacated other aspects of the 2008 DOL Rule and remanded the rule to DOL "so that the agency may correct its errors." *See id.* at 24. In particular, *CATA I* held invalid elements of the 2008 DOL Rule that pertained to the calculation of a prevailing wage. *See id.*; 73 Fed. Reg. at 78056.

Following *CATA I*, DOL promulgated a notice of proposed rulemaking ("NPRM") with respect to wage rate calculations. *Wage Methodology for the Temporary Non–Agricultural Employment H-2B Program*, 75 Fed. Reg. 61578-01, 61579 (October 5, 2010) ("2010 Wage NPRM"). After allowing for notice and comment, DOL announced a revised prevailing wage regulation in 2011. *Wage Methodology for the Temporary Non-agricultural Employment H-2B Program*, 76 Fed. Reg. 3452 (Jan. 19, 2011) ("2011 Wage Rule"). Although DOL initially set January 1, 2012, as the effective enforcement date for the 2011 Wage Rule, as of March 2013, DOL was still using the 2008 Wage Rule declared invalid in *CATA I*. *See CATA II*, 933 F. Supp. 2d at 708-09. The *CATA* plaintiffs successfully challenged DOL's continued use of the partially invalid 2008 DOL Rule, and in *CATA II* the Eastern District of Pennsylvania vacated the 2008 Wage Rule and barred its continued use. *See id.* at 709, 716.

At the same time that litigation was ongoing about DOL's 2008 Wage Rule, DOL began to promulgate a series of separate rules that addressed a broader range of revisions to the H-2B labor certification process, many of which were prompted by *CATA I. Temporary Non-Agricultural Employment of H-2B Aliens in the United States*, 76 Fed. Reg. 15130-01 (Mar. 18,

2011) (2011 Program Rules). DOL issued a final version of this rule in 2012. *Temporary Non-Agricultural Employment of H-2B Aliens in the United States*, 77 Fed. Reg. 10038, 10038-10146 (Feb. 21, 2012) (2012 Program Rules).

In 2012, other plaintiffs in Florida obtained a "preliminary injunction prohibiting DOL from enforcing" the 2012 Program Rules while litigation on the merits was ongoing. *Bayou Lawn & Landscape Servs. v. Solis*, No. 3:12CV183/MCR/CJK, 2012 WL 12887385, at *1 (N.D. Fla. Apr. 26, 2012). The Eleventh Circuit affirmed the preliminary injunction, on the ground that DOL lacked the authority to issue rules pertaining to the H-2B program, and remanded the case to the district court. *Bayou Lawn & Landscape Servs. v. Sec'y of Labor*, 713 F.3d 1080 (11th Cir. 2013). Thereafter, on the merits, the district court held that DOL lacked the "authority to engage in legislative rulemaking under the H-2B program," and so it vacated the 2012 Program Rules. *Bayou Lawn & Landscape Servs. v. Perez*, 81 F. Supp. 3d 1291, 1300 (N.D. Fla. 2014) ("*Bayou II*").

By the time the Eleventh Circuit considered the Government's appeal, DOL and DHS had issued the 2015 Rules. As a result, the challenge to the 2012 Program Rules was rendered moot, and the Eleventh Circuit vacated the district court's order and remanded the case. *Bayou Lawn & Landscape Servs. v. Sec'y, U.S. Dep't of Labor*, 621 F. App'x 620 (11th Cir. 2015).

In 2012, around the same time as the first *Bayou* challenge, other plaintiffs, in the Eastern District of Pennsylvania (not those in the *CATA* cases), challenged DOL's rules on a theory similar to the one used in *Bayou*. *See Louisiana Forestry Ass'n, Inc. v. Solis*, 889 F. Supp. 2d 711 (E.D. Pa. 2012). In that case, however, the Eastern District of Pennsylvania ruled that DOL *did* have the authority to promulgate the 2011 Wage Rule. *Louisiana Forestry Ass'n, Inc. v. Solis*, 889 F. Supp. 2d 711 (E.D. Pa. 2012). The Third Circuit subsequently affirmed, in an

apparent rejection of the Eleventh Circuit's holding in *Bayou*. *Louisiana Forestry Ass'n Inc. v. Sec'y U.S. Dep't of Labor*, 745 F.3d 653, 669 (3d Cir. 2014) (affirming *Louisiana Forestry*, 889 F. Supp. 2d 711).[9]

In response to *CATA II*'s vacatur of the 2008 Wage Rule and *Bayou*'s holding that DOL lacked rulemaking authority for the H-2B program, DHS and DOL jointly promulgated an interim final rule ("IFR") in 2013, to address wage determinations. *Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program, Part 2*, 78 Fed. Reg. 24047 (Apr. 24, 2013) ("2013 DHS/DOL Wage IFR"). But, DOL had not entirely abandoned the system used under the 2008 Wage Rule. *See CATA v. Perez*, 774 F.3d 173, 182 (3d Cir. 2014) ("*CATA III*"). Although the 2013 DHS/DOL Wage IFR formally eliminated the use of skill levels, it did not alter the practice of "allowing a prevailing wage to be set by use of either" a Bureau of Labor Statistics Occupational Employment Statistics Survey (OES) or a "private wage survey." *CATA III*, 774 F.3d at 181 & n.7; *see* 2013 DHS/DOL Wage IFR, 78 Fed. Reg. at 24061.

In 2014, DOL promulgated a proposed rule related to the Wage Methodology calculations for the H-2B program. *Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program*, 79 Fed. Reg. 14450 (Mar. 14, 2014). That rule indicated DOL's intent to conduct future rulemaking on the issue of the prevailing wage calculations but painted "an uncertain picture" of DOL's future plans in this respect. *See CATA III*, 774 F.3d at 182. The district court ruled in DOL's favor "on the ground that the proposed 2014 or 2015 rule-making process could result in a prospective change of the rules at issue such that plaintiffs' challenge

---

[9] As the Third Circuit observed, there is technically no circuit split, as the "three-member panel in *Bayou* opined only on whether the District Court abused its discretion in finding that the employer-plaintiffs were likely to succeed on the merits of their challenge to the DOL's rulemaking authority, not on whether the DOL actually has that authority or not." *Louisiana Forestry*, 745 F.3d at 675 n.17. As such, "[a] circuit split is thus not yet a foregone conclusion." *Id.* Indeed, as noted, that case was later rendered moot. *Bayou*, 621 F. App'x at 621.

was not ripe for adjudication." *Id.* at 182; *see Comite de Apoyo a los Trabajadores Agricolas v. Perez*, No. CIV.A. 14-2657, 2014 WL 4100708 (E.D. Pa. July 23, 2014), *rev'd and remanded*, *CATA III*, 774 F.3d 173.

The CATA plaintiffs sued again, in the Eastern District of Pennsylvania, challenging on various grounds DOL's continued use of private wage surveys. *See CATA III*, 774 F.3d at 181-82. In July 2014, the district court dismissed the case, without prejudice, on procedural grounds. *Id.* at 182. The Third Circuit reversed and remanded. *Id.* at 191-92.

Three months after *CATA III*, the Northern District of Florida vacated the 2008 DOL Rule and found, following *Bayou*, that DOL had no independent authority to issue legislative rules for the H-2B program. *Perez v. Perez*, No. 14-cv-682, 2015 U.S. Dist. LEXIS 27606 (N.D. Fla. Mar. 4, 2015). "Based on the *Perez* vacatur order and the permanent injunction, DOL ceased operating the H-2B program to comply immediately with the court's order." 80 Fed. Reg. 24151. The combination of *CATA III* and *Perez* "left DOL without a complete methodology or any procedures to set prevailing wages in the H-2B program." 80 Fed. Reg. at 24152.[10]

Because of the problems the *Perez* order caused, the *Perez* Court temporarily stayed its order until May 2015. In April 2015, to prevent "another program hiatus if and when the temporary stay expire[d]," DOL and DHS jointly issued the 2015 Wage Rule. *See id.* at 24152. According to the agencies, the 2015 Wage Rule "implements a key component of DHS's determination that it must consult with DOL on the labor market questions relevant to its adjudication of H-2B petitions." *Id.* at 24148. The 2015 Wage Rule finalized the 2013 DHS/DOL Wage IFR. *See* 2015 Wage Rule, 80 Fed. Reg. at 24151.

---

[10] As the agencies explain, the 2013 DHS/DOL Wage IFR left almost all "of the wage methodology and procedures from the 2008 [DOL] rule untouched." 2015 DHS/DOL Wage Rule, 80 Fed. Reg. at 24151. *CATA III* vacated a portion of the 2013 IFR—20 C.F.R. 655.10(f)—and *Perez* "then vacated the remainder of 20 C.F.R. 655.10." *Id.*

As a result of the *Perez* order and the temporary stay, DHS and DOL invoked the "good cause" exception in the Administrative Procedure Act ("APA") to make the 2015 Wage Rule effective immediately. *Id.* at 24,152-53; *see also* 5 U.S.C. § 553(d)(3). Although the agencies did not solicit additional comments before promulgating the 2015 Wage Rule, because that rule is similar to the 2013 DHS/DOL Wage IFR, the agencies concluded that the public had already had an adequate "opportunity to comment on all aspects of this final rule in response to the 2013 IFR." 2015 Wage Rule, 80 Fed. Reg. at 24151.

Simultaneous with the 2015 Wage Rule, DHS and DOL jointly issued the 2015 Interim Final Rule containing the 2015 Program Rules and the 2015 Enforcement Rules. The 2015 Program Rules are "virtually identical" to the 2012 Program Rules. *Temporary Non-Agricultural Employment of H-2B Aliens in the United States*, 80 Fed. Reg. 24042-01, 24043 (Apr. 29, 2015) (2015 Program Rules). However, the departments elected to reissue the rule jointly, in light of the various challenges to "DOL's authority to issue its own legislative rules to carry out its duties under the INA." *Id.* at 24,045 (citing *Bayou*, 713 F.3d 1080).

As with the 2015 Wage Rule, the departments invoked the APA's "good cause" exception to proceed without notice and comment. *Id.* at 24047. Nevertheless, the departments sought "public input on every aspect of this interim final rule (even though virtually every provision herein has already gone through one round of notice and comment), and [planned to] assess that input and determine whether changes are appropriate." *Id.* at 24050.

The *CATA* plaintiffs once again challenged these rules. In *CATA IV*, the plaintiffs challenged only the 2015 Wage Rule. *CATA v. Perez*, 148 F. Supp. 3d 361 (D.N.J. 2015) ("*CATA IV*"). The district court ruled for the Government, finding that the plaintiffs lacked standing. *Id.* at 374. And, in *Bayou III*, plaintiffs challenged the validity of each of the 2015

Rules. *Bayou Lawn & Landscape Servs. v. Johnson*, 173 F. Supp. 3d 1271, 1276 (N.D. Fla. 2016) ("*Bayou III*"). In *Bayou III*, the district court found that the plaintiffs in that case had standing, but their claims failed on the merits.

### D. Plaintiffs' Suit

As discussed, challenges to recent H-2B regulations have taken one or both of two approaches: Some contest the *substance* of the DHS or DOL Program regulations, such as the methodology by which H-2B wages are determined, and some contest the *structure* of the Program.

In this case, plaintiffs challenge the structure of the Program. They contend that DHS and DOL violated the INA and the APA, codified in various sections of 5 U.S.C., as well as the United States Constitution, by jointly issuing certain regulations with respect to the Program. ECF 44, ¶ 4; *see also id.* ¶¶ 94, 96. In particular, plaintiffs argue that DOL has no lawful authority to engage in legislative rulemaking with regard to the Program. *See* ECF 92-1 at 13.

According to plaintiffs, "Congress has granted DHS sole rulemaking and adjudicative authority for the H-2B program, has not granted such authority to DOL, has not granted shared or joint authority among multiple Departments, and has not permitted DHS to redelegate such authority to DOL." *Id.* As a result, plaintiffs maintain that DHS has unlawfully redelegated its authority to DOL, and the "jointly-issued" 2015 Rules promulgated by DHS and DOL are invalid. ECF 92-1 at 13-15.

In particular, plaintiffs contest the 2015 Program Rules, the 2015 Wage Rule, and the 2015 Enforcement Rules, as well as the 2008 Labor-Certification Regulations. The 2015 Rules establish "the process by which employers obtain a temporary labor certification from DOL for use in petitioning DHS to employ a[n H-2B] nonimmigrant worker," 80 Fed. Reg. at 24042; "the

methodology by which DOL calculates the prevailing wages to be paid to H-2B workers and U.S. workers recruited in connection with application for temporary labor certification," *id.* at 24146; and "enforcement procedures and remedies pursuant to DHS's delegation of enforcement authority to DOL." *Id.* at 24046.

Specifically, the 2015 Program Rules "expand[] the ability of U.S. workers to become aware of the job opportunities in question and to apply for opportunities in which they are interested" and "requir[e] that U.S. workers in corresponding employment receive the same wages and benefits as the H-2B workers." *See* 80 Fed. Reg. at 24043. The regulations also provide additional protections to H-2B workers (such as guaranteed minimum hours and reimbursements for visa and transportation expenses) and to whistleblowers. *See id.* The 2015 Wage Rule "set[s] the methodology by which DOL calculates the prevailing wages to be paid to H-2B workers and U.S. workers recruited in connection with applications for temporary labor certification." *See* 80 Fed. Reg. at 24146. In addition, plaintiffs challenge certain DHS regulations, "collectively referred to and identified . . . as DHS's Labor-Certification Regulations." ECF 44, ¶ 2; *see also id.*, ¶ 34; 8 C.F.R. § 214.2(h)(6). The Labor-Certification Regulations, issued in 2008, "govern DHS's administration of the H-2B program generally, including DOL's role in the program." ECF 69 at 11.

According to plaintiffs, the regulatory scheme is "unworkable" (ECF 44, ¶ 8) and causes unnecessary delay in visa processing. They assert that "H-2B workers are now arriving weeks, and often months, after employers' dates of need," which has harmed the businesses of plaintiffs and/or their members. *Id.* ¶ 8. Defendants observe that plaintiffs' labor certifications and H-2B

petitions have all been granted.  ECF 102-1 at 25; *see also* ECF 44, ¶¶ 15, 17.[11]  However, according to plaintiffs, this "regulatory scheme imposes more than $1,000,000,000 in compliance costs."  ECF 92-1 at 15.  Therefore, plaintiffs ask the Court to enter an Order "enjoining the Defendants nationwide from implementing the unlawful" 2015 Program Rules, the 2015 Wage Rule, and the 2008 Labor-Certification Regulations.  ECF 44, ¶ 115.

## II.    Standard of Review

The APA provides for judicial review of a final agency action.  *See Ergon-W. Virginia, Inc. v. United States Envtl. Prot. Agency*, 896 F.3d 600, 609 (4th Cir. 2018); *Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 629 n.3 (4th Cir. 2017); *Friends of Back Bay v. U.S. Army Corps of Eng'rs,* 681 F.3d 581, 586 (4th Cir. 2012); *Lee v. U.S. Citizenship & Immigration Servs.,* 592 F.3d 612, 619 (4th Cir. 2010); *Ohio Valley Envtl. Coal v. Aracoma Coal Co.,* 556 F.3d 177, 192 (4th Cir. 2009).  An agency's regulations must be set aside and held unlawful when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); when they are "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B); or when they are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

As noted, the Government submitted the Administrative Record.  ECF 46; ECF 87; ECF 129.  Generally, "claims brought under the APA are adjudicated without a trial or discovery, on the basis of an existing administrative record . . . ."  *Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.,* 524 F. Supp. 2d 642, 660 (D. Md. 2007) (citing *Citizens for*

---

[11] The Government has not seriously contested plaintiffs' standing to bring this suit at any point in the litigation.  Moreover, plaintiffs have adequately alleged economic harm as a result of the regulations.  See *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488 (1998) (APA standing); *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 342 (1977) (associational standing).

the *Scenic Severn River Bridge, Inc. v. Skinner,* 802 F. Supp. 1325, 1332 (D. Md. 1991), *aff'd,* 972 F.2d 338 (Table) (4th Cir. July 29, 1992)).  In this context, "review of the administrative record is primarily a legal question . . . ." *Skinner*, 802 F. Supp. at 1332.

"The APA provides that a reviewing court is bound to 'hold unlawful and set aside agency action' for certain specified reasons, including whenever the challenged act is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Friends of Back Bay,* 681 F.3d at 586-87 (quoting 5 U.S.C. § 706(2)(A)); *see United States v. Bean,* 537 U.S. 71, 77, (2002); *Camp v. Pitts,* 411 U.S. 138, 142 (1973) (per curiam); *N. Carolina Growers' Ass'n, Inc. v. United Farm Workers,* 702 F.3d 755, 763 (4th Cir. 2012) (quoting 5 U.S.C. § 706(2)). Review under the APA is highly deferential, however, and the agency action enjoys a presumption of validity and regularity. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders,* 430 U.S. 99 (1977); *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.,* 556 F.3d 177, 192 (4th Cir. 2009) (citing *Natural Res. Def. Council, Inc. v. EPA,* 16 F.3d 1395, 1400 (4th Cir.1993)). The party challenging an agency decision has the burden to demonstrate that the agency action was arbitrary or capricious. *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir.1995).

Notably, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency . . . ." *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).  In assessing an agency decision, "the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 378 (1989) (quoting *Overton Park,* 401 U.S. at 416).

"'Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes 'a rational connection between the facts found and the choice made.'" *Ohio Valley Envtl. Coal., Inc. v. United States Army Corps of Engineers*, 828 F.3d 316, 321 (4th Cir. 2016) (citation omitted); *see Trinity Am. Corp. v. U .S. EPA,* 150 F.3d 389, 395 (4th Cir. 1998); *Clevepak Corp. v. U.S. EPA,* 708 F.2d 137, 141 (4th Cir. 1983). However, and of import here, "[t]he 'arbitrary and capricious' standard is not meant to reduce judicial review to a 'rubber-stamp' of agency action." *Ohio Valley Envtl. Coal,* 556 F.3d at 192 (quoting *Ethyl Corp. v. Envtl. Prot. Agency,* 541 F.2d 1, 34 (D.C. Cir. 1976); *see also Ergon-W. Virginia, Inc.*, 896 F.3d at 609.

## Discussion

### III.    2008 Labor-Certification Regulations

As noted, plaintiffs challenge the 2015 Wage Rules, the 2015 Program Rules, the 2015 Enforcement Rules, and the 2008 Labor-Certification Regulations. I shall discuss the challenges to each of these rules in turn, along with defendants' defenses to them.

In 2008, DHS promulgated a regulation governing the H-2B program. *See* 73 Fed. Reg. 78104 (Dec. 19, 2008) (codified at 8 C.F.R. §§ 204, 214, 215). Although other regulations concerning labor certifications had been in place for many years, the 2008 regulation included a provision stating that an employer "may not file an H-2B petition unless the United States petitioner has applied for a labor certification with the Secretary of Labor . . . and has obtained a favorable labor certification determination." 8 C.F.R. § 214.2(h)(6)(iii)(C). Section 214.2(h)(6)(iv)(A) states: "An H-2B petition for temporary employment in the United States . . . shall be accompanied by an approved temporary labor certification from the Secretary of Labor stating that qualified workers in the United States are not available and that the alien's

employment will not adversely affect wages and working conditions of similarly employed United States workers."

Plaintiffs contest, *inter alia*, the requirement for an employer to first obtain "a favorable labor certification determination" from DOL before the employer may file an H-2B petition. *See, e.g.*, ECF 44, ¶¶ 34-39.

## A. Statute of Limitations

About ten years ago, DHS promulgated the regulation found in 73 Fed. Reg. 78104, published at 8 C.F.R. § 214.2. Therefore, I shall first address whether this portion of plaintiffs' claim is time-barred.

"[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). In general, when "plaintiffs bring a facial challenge to an agency ruling . . . 'the limitations period begins to run when the agency publishes the regulation.'" *Hire Order Ltd. v. Marianos*, 698 F.3d 168, 170 (4th Cir. 2012) (quoting *Dunn–McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1287 (5th Cir. 1997)). But, this general statute of limitations "'does not foreclose subsequent examination of a rule where properly brought before this court for review of further [agency] action applying it.'" *N.L.R.B. Union v. Fed. Labor Relations Auth.*, 834 F.2d 191, 195-96 (D.C. Cir. 1987) (quoting *Functional Music, Inc. v. F.C.C.*, 274 F.2d 543, 546 (D.C. Cir. 1958)).

Despite plaintiffs' vague protests to the contrary, this suit clearly represents a facial, rather than an as-applied, challenge. *See* ECF 44, ¶¶ 94, 95, 96 (challenging "Defendants' *issuance* of the 2015 Program Rules, the 2015 Wage Rule, and DHS's Labor-Certification Regulations" (emphasis added)); *see also Hire Order*, 698 F.3d at 170. Because this is a facial

challenge, the statute of limitations presumptively began to run in 2008. *Hire Order*, 698 F.3d at 170; ECF 102-1 at 24. If that is the case, plaintiffs' 2016 lawsuit—filed eight years after DHS promulgated the 2008 regulation—is untimely.

In an attempt to forestall this conclusion, plaintiffs invoke the "reopening doctrine," ECF 111-1 at 50, a theory derived from D.C. Circuit case law. According to this doctrine, "where an agency conducts a rulemaking or adopts a policy on an issue at one time, and then in a later rulemaking restates the policy or otherwise addresses the issue again without altering the original decision," the six-year statute of limitations begins anew when the agency "reopens" the original decision. *Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.* ("*NARPO*"), 158 F.3d 135, 141 (D.C. Cir. 1998) (quoting *United Transp. Union Illinois Legislative Bd. v. STB*, 132 F.3d 71, 75-76 (D.C. Cir. 1998)). Under this doctrine, "'when the agency . . . by some new promulgation creates the opportunity for renewed comment and objection, affected parties may seek judicial review, even when the agency decides not to amend the long-standing rule at issue.'" *P & V Enterprises v. U.S. Army Corps of Engineers*, 516 F.3d 1021, 1023-24 (D.C. Cir. 2008) (quoting *Gen. Motors Corp. v. EPA,* 363 F.3d 442, 449-50 (D.C. Cir. 2004)).

To determine whether an agency has "reopened" its earlier rulemaking and thus restarted the statute of limitations, a court "must look to the entire context of the rulemaking including all relevant proposals and reactions of the agency." *NARPO*, 158 F.3d at 141 (quoting *Public Citizen v. NRC,* 901 F.2d 147, 150 (D.C. Cir. 1990)). This includes, *inter alia*, both explicit and implicit evidence, as well as the language of the agency's notice of proposed rulemaking and the "agency's response to comments filed by parties during a rulemaking." *Id.* at 142-46. Although either the actual or implicit reconsideration of an existing regulation can suffice, the reopening doctrine only applies where this evidence "demonstrates that the agency 'ha[s] undertaken a

*serious, substantive reconsideration* of the [existing] rule.'" *P&V Enterprises*, 516 F.3d at 1024 (emphasis added) (quoting *Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 70 F.3d 1345, 1352 (D.C. Cir. 1995)). An agency may also constructively reopen an existing regulation "if the revision of accompanying regulations 'significantly alters the stakes of judicial review,' as the result of a change that 'could have not been reasonably anticipated.'" *Sierra Club v. E.P.A.*, 551 F.3d 1019, 1025 (D.C. Cir. 2008) (quoting *Kennecott Utah Copper Corp. v. Dep't of Interior*, 88 F.3d 1191, 1227 (D.C. Cir. 1996) and *Envtl. Def. v. EPA*, 467 F.3d 1329, 1334 (D.C. Cir. 2006)).

Even assuming, *arguendo*, that the Fourth Circuit would recognize the reopening doctrine, it does not apply here. *See Indep. Cmty. Bankers of Am. v. Nat'l Credit Union Admin.*, No. 1:16CV1141 (JCC/TCB), 2017 WL 346136, at *4 (E.D. Va. Jan. 24, 2017) ("The Court can find no Supreme Court or Fourth Circuit precedent recognizing the reopening doctrine. As such, the doctrine's status in this Circuit is unsettled."). None of the 2015 Rules reopened DHS's 2008 decision to require an employer to first obtain "a favorable labor certification determination" from DOL before applying for an H-2B visa. *See* 8 C.F.R. §§ 214.2(h)(6)(iii)(C), (iv)(A).

First, although the 2015 Interim Final Rule "establishes the process by which employers obtain a temporary labor certification from DOL for use in petitioning DHS to employ a nonimmigrant worker in H-2B status," 80 Fed. Reg. at 24042, the 2015 Interim Final Rule does not reconsider DHS's initial decision to require such certifications. The Executive Summary of the 2015 Interim Final Rule itself makes this clear, 80 Fed. Reg. at 24042-43 (emphasis added):

> Under DHS regulations, an H-2B petition for temporary employment must be accompanied by an approved temporary labor certification from DOL, which serves as DOL's advice to DHS regarding whether a qualified U.S. worker is available to fill the petitioning H-2B employer's job opportunity and whether a foreign worker's employment in the job opportunity will adversely affect the wages or working conditions of similarly employed U.S. workers. See 8 CFR 214.2(h)(6)(iii)(A) and (D).

> This interim final rule, which is virtually identical to the 2012 final rule that DOL developed following public notice and comment, *improves DOL's ability to determine whether it is appropriate to grant a temporary employment certification.*
>
> \* \* \*
>
> The Departments believe that these procedures and additional worker protections will lead to an improved temporary employment certification process.

In other words, although the 2015 Interim Final Rule reiterates the temporary labor certification requirement, as set forth in the 2008 Labor-Certification Regulations, the 2015 Interim Final Rule's clear objective is to establish "the process by which employers obtain a temporary labor certification from DOL for use in petitioning DHS to employ a nonimmigrant worker in H-2B status." *Id.* at 24042; *see also id.* at 24045 ("DHS has therefore made DOL's approval of a temporary labor certification a condition precedent to the acceptance of the H-2B petition. . . . This interim final rule establishes the process by which employers obtain a temporary labor certification and the protections that apply to H-2B workers and corresponding workers.").

In arguing to the contrary, plaintiffs point to "the second line of the 2015 IFR," which says that the rules relate to "'8 C.F.R. Part 214.'" *See* 80 Fed. Reg. at 24042; ECF 111-1 at 51. According to plaintiffs, "This line means that the 2008 DHS Rule was 'directly affected' by the 2015 IFR." ECF 111-1 at 51. This misconstrues the requirement and purpose of the reopening doctrine, which only applies when an agency engages in *"serious, substantive reconsideration"* of an existing rule. *P&V Enterprises*, 516 F.3d at 1024 (emphasis added) (quoting *Nat'l Mining Ass'n,* 70 F.3d at 1352). The mere citation to "8 C.F.R. Part 214" cannot suffice to restart the clock for every subpart of a 186-page long regulatory provision that includes 16 separate subsections. *See also Am. Iron & Steel Inst. v. U.S. E.P.A.*, 886 F.2d 390, 398 (D.C. Cir. 1989).

Second, plaintiffs argue that in the 2015 Interim Final Rule, DHS "affirmatively requested public comment on all issues." ECF 111-1 at 51. To be sure, the 2015 IFR states that it "seek[s] public input on every aspect of this interim final rule." 80 Fed. Reg. at 24050. However, just as the mere invocation of a subsection of the C.F.R. does not trigger the reopening doctrine, neither does the agency's decision to welcome general comments on "every aspect" of an interim final rule. *See Indep. Cmty. Bankers of Am.*, 2017 WL 346136, at 4 ("Merely welcoming general comments beyond the scope of a proposed rulemaking does not affect a 'regulatory reset.'"); *see also NARPO*, 158 F.3d at 142 ("When an agency invites debate on some aspects of a broad subject . . . it does not automatically reopen all related aspects including those already decided.").

Finally, plaintiffs contend that DHS "constructively reopened" the 2008 regulation by changing "'the regulatory context in such a way that could not have been reasonably anticipated by the regulated entity and is onerous to its interests.'" ECF 111-1 at 52 (quoting *Envtl. Def. v. E.P.A.*, 467 F.3d 1329, 1334 (D.C. Cir. 2006)). Plaintiffs suggest that this is so because "regulated employers could not have reasonably anticipated that a court would vacate the 2008 DOL Rule and DHS would respond by promulgating its own, far-more onerous replacement regulations." *Id.* This falls short of the type of "sea change" required to trigger a "constructive reopening." *See Nat. Res. Def. Council v. E.P.A.*, 571 F.3d 1245, 1266 (D.C. Cir. 2009). Instead, as in *Natural Resources Defense Council*, "The basic regulatory scheme remains unchanged." *Id.*

As a result, plaintiffs' challenge to the 2008 Labor-Certification Regulations is barred by the six-year statute of limitations.

## B. Scope of 8 U.S.C. § 1184

Because plaintiffs' challenge to the 2008 Labor-Certification Regulations is time-barred, I need not consider whether the regulations are within the scope of the relevant statutes. However, even if plaintiffs' claims are not time-barred, the 2008 Labor-Certification Regulations would survive.

Defendants maintain that 8 U.S.C. § 1184(c)(1), which authorizes DHS to determine whether to import an H-2B worker "after consultation with appropriate agencies of the Government," supports DHS's policy of conditioning approval of H-2B visa petitions on a favorable labor certification from DOL. ECF 102-1 at 29. But, plaintiffs charge that by establishing this requirement, without an opportunity for an employer to appeal an adverse decision to DHS, DHS has abdicated its statutory responsibility to adjudicate all H-2 visa petitions, and has impermissibly redelegated its authority to another agency. *See* ECF 92-1 at 48-49.

Plaintiffs rely, *inter alia*, on *G.H. Daniels III & Assocs., Inc. v. Perez*, 626 F. App'x 205 (10th Cir. 2015), *as amended* (Nov. 5, 2015), an unpublished Tenth Circuit decision that found an impermissible delegation of DHS's authority in the H-2B visa context. The *Daniels* Court looked to the definition of "consultation" and noted that it meant, *inter alia*, "to seek advice." *Id.* at 210-11. Based on this definition, the court stated that "advice is only that; it can, and sometimes should, be prudently ignored." *Id.* at 211. But, the court reasoned that DHS had "no ability to ignore DOL's advice if a certification has been denied[, and thus] DOL ha[d] effectively supplanted DHS as final decision-maker as to whether to allow for the admission of some H-2B workers." *Id.* (alterations added). The Tenth Circuit concluded, "That is a subdelegation." *Id.* And, because the Government had not presented any statute allowing such a

delegation, the court found that it was improper. *Id.* at 212.[12] As a result, the *Daniels* Court reversed the district court's dismissal of the plaintiff's challenge to the 2008 Labor-Certification Regulations. *Id.* at 215. Of import here, however, the regulations were never vacated or enjoined by the district court.

The Tenth Circuit's decision is contrary to the Third Circuit's ruling in *Louisiana Forestry Ass'n Inc. v. Sec'y U.S. Dep't of Labor*, 745 F.3d 653 (3d Cir. 2014). The Third Circuit, in reviewing DOL's 2011 Wage Rule, discussed and approved of the Government's entire regulatory scheme. *See id.* at 673-76. Applying *Chevron* deference, *see Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 845 (1984), the Third Circuit determined that DHS had reasonably interpreted the consultation provision of 8 U.S.C. § 1184(c)(1) to allow it to "*condition*[] its own granting of an H-2B visa petition on the DOL's grant of a temporary labor certification." 745 F.3d at 670, 673 (emphasis in original; alteration added).

In the view of the Third Circuit, DHS "did not impermissibly subdelegate all of its authority in this area." *Id.* The court reasoned that a rule requiring H-2B employers "to first obtain a temporary labor certification from the DOL on the questions of whether there are United States workers capable of performing the job in question and the impact of the aliens' employment on United States workers, and giving the DOL discretion to issue a limited set of rules governing the certification process," was a permissible exercise of DHS's "broad authority" to determine its obligations under the statute. *Id.* at 672-73.

In support, the Third Circuit cited *U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554, 567 (D.C. Cir. 2004), for the proposition that "a federal agency entrusted with broad discretion to permit or

---

12 Notably, in that case, the court did not consider the Government's alternative argument, i.e., that Congress had authorized delegation under 8 U.S.C. § 1103(a)(6). *See* ECF 102-1 at 38-43; *Daniels*, 626 F. App'x at 212 n.10.

- 27 -

forbid certain activities may condition its grant of permission on the decision of another entity . . . so long as there is a reasonable connection between the outside entity's decision and the federal agency's determination."

On this question, I am persuaded by the Third Circuit's analysis. As that court noted, 745 F.3d at 673: "The DOL has been involved in the administration of the nation's immigration laws since its inception in 1913, and for the past six decades, has provided temporary labor certifications in some form to the government agency charged with administering the nation's immigration laws concerning admission of temporary non-agricultural workers." Given DOL's "institutional expertise in labor and employment matters, as well as [DOL's] history of rulemaking authority in the context of the H-2B program," the Third Circuit found a "reasonable connection" between DOL's labor certification decisions and DHS's H-2B petition decisions. *Louisiana Forestry*, 745 F.3d at 673. Furthermore, the court said, *id.* at 672: "Although the DHS's decision to grant an H-2B petition depends, in part, on whether or not the DOL issues a temporary labor certification to the petitioner-employer, it is the DHS—not the DOL—that must determine whether the other criteria for an H-2B visa have been satisfied." Therefore, the court concluded that 8 C.F.R. § 214.2 "does not effect a delegation of authority, but instead provides for a type of 'legitimate outside party input into agency decision-making processes.'" *Id.* (quoting *U.S. Telecom Ass'n*, 359 F.3d at 566).

This conclusion is further bolstered by 8 U.S.C. § 1101(a)(15)(H)(ii)(b), which provides, as part of the definition of an H-2B worker, that "unemployed persons capable of performing [the H-2B worker's] service or labor cannot be found in this country . . . ." A plain reading of this language lends credence to defendants' use of the DOL's labor certification as a condition

precedent.  If unemployed Americans are available for the job, then by the terms of the statute no H-2B workers can be imported.

Thus, in my view, the 2008 Labor-Certification Regulations follow from a reasonable interpretation of DHS's statutory authority.

## IV.    2015 Rules

Plaintiffs challenge the 2015 Program Rules, the 2015 Wage Rule, and the 2015 Enforcement Rules on several grounds.  As an initial matter, plaintiffs assert that defendants failed to identify the legal authority for their joint rulemaking.  *See* ECF 92-1 at 28-29.  Their primary argument, however, is that DHS has no power to confer rulemaking authority on DOL.  Moreover, plaintiffs assert that DHS and DOL cannot "jointly issue" rules, because rulemaking authority was delegated by Congress to DHS alone, and Congress did not authorize the redelegation of authority to DOL.  *See id.* at 31-44.

### A.  Identification of Authority

A notice of proposed rulemaking must contain a "reference to the legal authority under which the rule is proposed."  5 U.S.C. § 553(b)(2).  And, when ready to finally publish, the relevant agency "shall incorporate in the rules adopted a concise general statement of their basis and purpose."  *Id.* § 553(c).  However, as defendants correctly note, "this requirement is not onerous, and requires only sufficient notice of the legal authority exercised to apprise the public of the source of the authority and permit the public to comment on it."  ECF 102-1 at 46 (citing *Louisiana Forestry*, 745 F.3d at 676-77; *Nat'l Tour Brokers Ass'n v. United States*, 591 F.2d 896, 900 (D.C. Cir. 1978)).

In my view, DHS and DOL adequately cited the legal basis for their authority to issue the 2015 Rules.  The 2015 Rules cite, *inter alia*, 8 U.S.C. §§ 1101, 1103, and 1184 as the basis for

DHS and DOL's rulemaking authority, as well as 8 C.F.R. § 214.2. *See* 80 Fed. Reg. at 24108 (2015 Program Rules); 80 Fed. Reg. at 24131 (2015 Enforcement Rules); 80 Fed. Reg. at 24184 (2015 Wage Rule). This is enough to stave off a challenge on the basis of inadequate citation of legal authority.

### B. DOL's Rulemaking Authority

Whether DOL may lawfully issue legislative rules concerning the Program is a close question. Plaintiffs correctly observe that "only Congress may grant rulemaking, adjudicative, or enforcement authority to an agency." ECF 92-1 at 30; *see Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."). The Government has not identified any statute that explicitly gives DOL such authority. Instead, it offers several arguments for why explicit congressional authorization is unnecessary. Most of these arguments are unpersuasive, and the Government's circular retreat from one to the next in both briefing and argument reveals the fragility of its position.

However, for several reasons, I am ultimately convinced that the Program's current regulatory scheme is consistent with Congress's intent.

### 1.

The Government relies heavily on the Third Circuit's decision in *Louisiana Forestry*, 745 F.3d 653, discussed earlier. *See, e.g.*, ECF 102-1 at 34. The district court's opinion in that case, which the Third Circuit affirmed, is also informative. *See Louisiana Forestry Ass'n, Inc. v. Soli*s, 889 F. Supp. 2d 711 (E.D. Pa. 2012). Judge Legrome Davis's artful decision concerning the 2011 Wage Rule frames DOL's long history with the Program.

The district judge recounted, as discussed earlier, that "the modern H-2B visa program was created in 1986 through the enactment" of the IRCA, "which bifurcated the existing H–2 visa program into agricultural [H-2A] and non-agricultural [H-2B] components. At the time of IRCA's enactment, the DOL regulations governing the labor certification process for non-agricultural, unskilled guest workers already had been in place for many years." *Id.* at 728. In fact, DOL had been issuing legislative rules, strikingly similar to the 2015 Rules at issue here, as far back as 1968. *See* 33 Fed. Reg. 7570-71.

The 1968 rules, then published at 20 C.F.R. § 621, concerned labor certifications for employers seeking temporary nonagricultural workers. Notably, the 1968 rules cite the very same authority that DOL cited in 2015: 8 U.S.C. § 1101, 8 U.S.C. § 1184, and 8 C.F.R. § 214.2. *See Certification of Temporary Foreign Labor for Industries Other Than Agriculture or Logging*, 33 Fed. Reg. 7570, 7571 (May 22, 1968) (establishing DOL labor certifications). Moreover, the statutory language of 8 U.S.C. §§ 1101 and 1184 remains "materially identical" to the versions from the 1960s. *See Louisiana Forestry*, 889 F. Supp. 2d. at 728. Those DOL rules stood intact for decades, having no more statutory basis than the 2015 Rules have.

The district court in *Louisiana Forestry* also emphasized that Congress revisited this part of the U.S. Code when it passed the IRCA, splitting the H-2 program into agricultural (H-2A) and nonagricultural (H-2B) components. The IRCA altered 8 U.S.C. § 1101(a)(15)(H)(ii)(a) (the agricultural component) to specifically refer to the Secretary of Labor. But, the law left § 1101(a)(15)(H)(ii)(b) (the Program) unchanged.

Plaintiffs argue that the doctrine of *expressio unius* weighs against DOL's authority, because Congress "imposed a labor-certification requirement" for the H-2A program, but did not mention DOL or labor certifications under the authorizing statute for the H-2B program. *See*

ECF 111-1 at 20. This is a plausible interpretation, but it is not the only interpretation. It may be, as counsel for *amici* suggested during oral argument, that Congress sought to direct the administration of the H-2A program by specifically designating DOL and the Department of Agriculture as the *only* "appropriate agencies of Government" with which to consult. *See* ECF 126 at 48; 8 U.S.C. § 1184(c)(1). By contrast, DHS may consult with any appropriate agencies for purposes of the H-2B program. *See* 8 U.S.C. § 1184(c)(1).

Of course, for more than 50 years, DHS (or its predecessor) has consulted with DOL. And, throughout that period, Congress has never gainsaid that decision or DOL's rulemaking in the context of the Program. As Judge Davis observed in *Louisiana Forestry*, 889 F. Supp. 2d at 729: "In enacting IRCA, Congress chose to leave intact the statutory text governing nonagricultural workers, and, by implication, the preexisting regulatory scheme."

Certainly, Congress was aware that DOL was involved in rulemaking. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978). And, only four years before IRCA's passage—before the agricultural and nonagricultural components were divided—the Supreme Court drew attention to DOL's H-2 program rulemaking in the case of *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 595-96 (1982). In that case, the Supreme Court noted that "the Secretary of Labor [makes] initial determinations" of labor market availability, and that employers who wish to import foreign workers must follow DOL's rules to obtain a labor certification. *Id.*

Accordingly, Judge Davis concluded that, "at the time of IRCA's enactment, Congress was presumptively aware of the Court's interpretation of 8 U.S.C. § 1184(c) as authorizing DOL regulations governing labor certifications." *Lousiana Forestry*, 889 F. Supp. 2d at 729 (citing

*Lorillard*, 434 U.S. at 580-81). Further, Judge Davis noted that parts of IRCA's legislative history made explicit reference to DOL's rules. *Louisiana Forestry*, 889 F. Supp. 2d at 729 (citing H.R. Rep. No. 99-682, pt. 1, at 80 (1986), 1986 U.S.C.C.A.N. 5649, 5684).

"It is well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986) (citations and internal quotation marks omitted). "Since IRCA's enactment, Congress has chosen, on multiple occasions, to leave the DOL's rulemaking in the H-2B context intact," Judge Davis wrote. *Louisiana Forestry*, 889 F. Supp. 2d at 729. "In 2005, Congress amended the H-2B program to confer enforcement powers on the DOL, without abrogating the DOL's legislative rulemaking authority." *Id.*

Furthermore, as defendants assert, "Congress has chosen (on multiple occasions) to endorse the agencies' joint action and/or DOL's participation in the H-2B program by funding the very program Plaintiffs now challenge." ECF 102-1 at 38 n.12 (citing Department of Labor Appropriations Act, 2016, Pub. L. No. 114-113, §§ 111-13, 129 Stat at 2599). Congress has referred to rules promulgated by DOL pertaining to the Program in both appropriations bills (*see id.*) and conference reports for appropriations bills. *See* 157 Cong. Rec. H7528 (Nov. 14, 2011) (directing the Secretary of Labor to "continue to apply the rule entitled 'Labor Certification Process and Enforcement for Temporary Employment in Occupations Other Than Agriculture or Registered Nursing in the United States (H-2B Workers), and Other Technical Changes' published by the Department of Labor on December 19, 2008 (73 Fed. Reg. 78020 *et seq.*).").

Plaintiffs take issue with this argument, calling it a "*post hoc* rationalization," and noting again that Congress has never extended explicit rulemaking authority to DOL in this context. *See* ECF 111-1 at 43-44. They posit, *id.* at 44: "Acquiescence (i.e., congressional silence) cannot possibly qualify as a 'clear' or 'affirmative' or 'express' statement of rulemaking authority . . . ." *See also Bayou*, 713 F.3d at 1085 ("Furthermore, if congressional silence is a sufficient basis upon which an agency may build a rulemaking authority, the relationship between the executive and legislative branches would undergo a fundamental change and 'agencies would enjoy virtually limitless hegemony . . . .'" (quoting *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995))).

But, in my view, and in light of the principles articulated by the Supreme Court, Congress has not been silent. In *Louisiana Forestry*, 889 F. Supp. 2d at 728, Judge Davis concluded that "the history of the H-2B program demonstrates Congress's expectation that the DOL would engage in legislative rulemaking." I concur. DOL is not engaged in some sudden power-grab. DOL has not simply been *involved* in the H-2B program; it has actually been issuing legislative rules since the 1960s. Moreover, "DOL's rulemaking in the H-2B program is also consistent with the objective of the statute creating the H-2B visa program, which is to permit U.S. employers to bring foreign workers to the United States to perform temporary non-agricultural work, provided that 'unemployed persons capable of performing . . . service or labor cannot be found in this country.'" *Id.* at 730 (quoting 8 U.S.C. § 1101(a)(15)(H)(ii)(b)).

**2.**

I shall briefly explain why I agree with the Third Circuit, rather than the Eleventh Circuit, on the question of DOL's rulemaking authority.

In *Bayou*, 713 F.3d at 1084, the Eleventh Circuit, upholding the district court's preliminary injunction of DOL's 2012 Program Rules, rejected the Government's argument that DHS's authority to consult with DOL under 8 U.S.C. § 1184(c)(1) enabled DOL to issue legislative rules. The *Bayou* Court stated, *id.*:

> We reject this interpretation of "consultation." Under this theory of consultation, any federal employee with whom the Secretary of DHS deigns to consult would then have the "authority to issue legislative rules to structure [his] consultation with DHS." This is an absurd reading of the statute and we decline to adopt it.
>
> DHS was given overall responsibility, including rulemaking authority, for the H-2B program. DOL was designated a consultant. It cannot bootstrap that supporting role into a co-equal one.

Indeed, if DHS decided tomorrow that, rather than collaborating with DOL in the same way it and its predecessor have done for half a century, it preferred to consult only with the Department of Transportation—or, as the *Bayou* Court suggests, with a particular employee at the Department of Transportation—that new consultant's ability to issue rules would be gravely in doubt. For one, plaintiffs could make a strong argument that the choice to consult with the Department of Transportation, which has no experience or expertise in assessing labor markets, is an arbitrary and capricious one. More important, that new consulting relationship would bear none of the hallmarks of Congressional acknowledgement and approval that are present here.

I acknowledge the apparent rarity of finding rulemaking authority without explicit statutory authority. Plaintiffs assert in their supplemental briefing, ECF 124 at 3-4: "The only individual that has ever determined that DOL should be a consultant is the Secretary of Homeland Security or her predecessors." But, that is not the whole story. As discussed, Congress has repeatedly and over a long period recognized DOL's role, and the validity of its rules, albeit not via statute. *See Louisiana Forestry*, 745 F.3d at 674. Given this history, I am not persuaded to take from DOL a power that it has openly exercised for decades.

## C. Defendants' Other Arguments

### 1. The Delegation Provision of the INA

The Government maintains that 8 U.S.C. § 1103(a)(6) gives DHS the power to delegate any of its responsibilities, including rulemaking, to anyone in the federal government, including the Secretary of Labor. *See* ECF 102-1 at 25, 46 n.22; ECF 113 at 37. The Government employs this argument largely to defend DHS's decision to seek temporary labor certifications from DOL, but reprises it to justify DOL's role in the 2015 Rules. *See id.*

Although the scope of DHS's authority to delegate under § 1103(a)(6) is something of a gray area, I am not entirely convinced by defendants' argument. For one, the statutory language does not seem to support a delegation of this breadth. Section 1103(a)(6) provides: "[The Secretary of Homeland Security] is authorized to confer or impose upon any *employee* of the United States . . . any of the *powers, privileges, or duties* conferred or imposed by this chapter or regulations issued thereunder upon *officers or employees of the Service*." (Emphasis added.)

The language presents two potential obstacles to defendants' interpretation: First, is rulemaking authority one of the "powers, privileges, or duties" conferred on "officers or employees of the Service?" It would seem not. In the same statutory section, Congress has instructed that the Secretary of Homeland Security "shall establish such regulations . . . as he deems necessary for carrying out his authority . . . ." 8 U.S.C. § 1103(a)(3). Although the Secretary may subdelegate his responsibilities to subordinate agencies and officers, the power to issue regulations is conferred on him by Congress.

Second, given the general rule that only Congress can confer rulemaking authority, discussed *supra*, there would appear to be a presumption against the theory that the head of one agency can in fact assign the power to issue binding rules to "any employee" of another agency.

Under the Government's reading, could the Secretary of Homeland Security confer rulemaking authority on a health inspector for the Department of Agriculture, or on a private in the U.S. Army? Defendants have offered no limiting principle for their interpretation. On this basis, it is not clear that DHS validly delegated rulemaking authority to DOL, such that DOL could issue the 2015 Rules.

My conclusion is qualified, however, in the context of the 2015 Enforcement Rules. Section 1184(c)(14)(B) provides: "The Secretary of Homeland Security may delegate to the Secretary of Labor, with the agreement of the Secretary of Labor, any of the authority given to the Secretary of Homeland Security under subparagraph (A)(i)." Subparagraph (A)(i) authorizes the Secretary of Homeland Security to impose administrative remedies on employers who fail to meet any of the conditions of their H-2B petitions. *Id.* § 1184(c)(14)(A).

Pursuant to this section, DHS formally redelegated a portion of its enforcement authority to DOL in January of 2009. *See* AR003764-65 ("Delegation of Authority to the Department of Labor under Section 214(c)(14)(A) of the Immigration and Nationality Act"). The Inter-Agency Agreement accompanying the delegation letter provided that "DOL will issue regulations as needed for the implementation and operation of the enforcement authority . . . ." AR003768. Plaintiffs concede that DHS may delegate some of its enforcement power under the statute. *See* ECF 92-1 at 50. However, they assert that the delegable authority does not include the power to make rules or regulations. *Id.* at 50-51.

Given that Congress clearly anticipated that DOL would be delegated some enforcement authority, it seems likely that Congress also anticipated that DOL might need to engage in limited rulemaking to support its enforcement efforts.

Plaintiffs do not discuss the 2015 Enforcement Rules with any degree of particularity. *See* ECF 92-1 at 50-52. DOL has been delegated the power to "impose administrative remedies" on an employer, "in addition to any other remedy authorized by law," once DOL "finds, after notice and an opportunity for a hearing, a substantial failure to meet any of the conditions of the petition to admit or otherwise provide status to" an H-2B worker. *See* 8 U.S.C. § 1184(c)(14). To the extent that the 2015 Enforcement Rules support that lawfully delegated power, those rules are permissible.

### 2. Joint Rulemaking

Defendants also maintain that, were the Court to conclude that DOL has no authority to issue rules, this defect could be somehow remedied by the "joint issuance" of these rules with DHS. The Government asserts that "there is nothing inherently impermissible about joint rulemaking." ECF 102-1 at 43. Indeed, there are many examples of joint rulemaking. *See* Jody Freeman & Jim Rossi, *Agency Coordination in Shared Regulatory Space*, 125 Harv. L. Rev. 1131, 1165-68 (2012) (collecting examples). However, as plaintiffs point out, agencies tend to use joint rulemaking "where Congress has allocated each of them a role implementing one or a set of related statutes." *Id.* at 1167.

Defendants do not point to any examples of joint rulemaking where only one agency has rulemaking authority, and the other agency simply consents to be subject to those rules. Rather, they contend that "neither the INA nor the APA prohibit the agencies' jointly issued rules, and plaintiffs cite no authority that mandates that joint rules may only be issued through express congressional authorization." ECF 102-1.

To be sure, joint rulemaking is not prohibited, and it may even be advisable where agencies have overlapping jurisdiction. But, the Government has presented no authority to suggest that joint rulemaking carries any independent legal significance.

Defendants assert that "the agencies' joint participation in 2015 eliminates any doubt that any part of the rules was issued without ample authority." ECF 102-1 at 44. As support for this proposition, defendants quote from their own rule: "To ensure that there can be no question about the authority for and validity of the regulations in this area, DHS and DOL . . . together are issuing this interim final rule." *Id.* (quoting 80 Fed. Reg. at 24045). But wishing does not make it so. The concern with defendants' prior rules issued by DOL has never been skepticism that DOL and DHS shared the same goals; it was that DHS and DOL cannot lawfully achieve those goals in this manner.

The Government also relies on the decisions of the Northern District of Florida and the Eleventh Circuit to support their theory that joint rulemaking solves prior problems of authority. They note that "the same district court that twice issued an injunction against DOL's unilaterally issued H-2B rules . . . has since concluded that the joint rules at issue in this case are a valid exercise of DHS's authority." ECF 102-1 at 44 (citing *Bayou III*, 173 F. Supp. 3d at 1277, 1289-91). The district court in *Bayou III*, considering the 2015 Rules, did not expressly endorse defendants' joint rulemaking, but it did observe in a footnote that although "DOL did not have unilateral authority to promulgate H-2B regulations . . . . [t]he 2015 Program Rule and Wage Rule were promulgated jointly by DHS and DOL in response." *Id.* at 1277 n.2. The court upheld the 2015 Rules. *Id.* at 1292. To the extent that this ruling carries any weight, it supports the Government. However, given that the *Bayou III* Court declined to discuss the joint rulemaking in any detail, the case's persuasive value as to this point is minimal.

On this question, the significance of the Eleventh Circuit's opinion in *Bayou*, 713 F.3d 1080, is thinner still. Defendants observe that the court rejected the proposition that DOL "is empowered to engage in rulemaking, even without the DHS." *Id.* at 1084. They reason that the inverse must also be true: "where DOL issues rules jointly with, rather than 'without' DHS, such jointly promulgated rules are unquestionably fully consistent with the INA and APA." ECF 102-1 at 45. I am unable to discern anything in the Eleventh Circuit's decision that supports this inference.

In the alternative, defendants assert, in a footnote, that "it is unnecessary for the Court to reach the question of DOL's rulemaking authority because the joint rules are a proper exercise of DHS's rulemaking authority. See 8 U.S.C. § 1103(a)(3). In such a case, DOL's signature would be surplusage; it would not invalidate the rule." ECF 102-1 at 44 n.20. However, defendants do not adequately explain how DHS alone could issue a rule that purports to govern the Secretary of Labor and his subordinates, and is published under DOL's title of the Code of Federal Regulations.

## V.     Conclusion

Plaintiffs' suit attacks the 2008 Labor-Certification Regulations and the 2015 Rules. Their challenge to the former is time-barred, and, even if it were not, the regulations are consistent with the statute. Furthermore, I am persuaded that the 2015 Rules are consistent with Congress's intent, given DOL's long history of rulemaking in the context of the Program.

For the reasons stated above, I shall DENY Plaintiffs' Motion and I shall GRANT Defendants' Motion. Judgment shall be entered in favor of the Government.

A separate Order follows, consistent with this Memorandum Opinion.


Date: September 12, 2018                          _____/s/_____
                                                 Ellen Lipton Hollander
                                                 United States District Judge